# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-20569
c/w No. 13-20751

United States Court of Appeals
Fifth Circuit

**FILED**

June 22, 2015

Lyle W. Cayce
Clerk

AMANDA CULBERTSON; JORGE WONG,

Plaintiffs - Appellants

v.

PAT LYKOS; RACHEL PALMER; HARRIS COUNTY,

Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

Former employees of the college that had contracted to oversee breath alcohol testing for the Harris County Sheriff's Office brought suit against the County, the District Attorney, and one of her assistants, for causing their termination by the college. The suit was brought under Section 1983 for violations of the plaintiffs' First Amendment rights. State law claims were also brought. The district court dismissed all claims and awarded attorneys' fees to the defendants. We conclude that some of the claims should not have been dismissed. We REVERSE in part, REVERSE the award of attorneys' fees, and REMAND for further proceedings.

No. 13-20569 c/w 13-20751

FACTUAL AND PROCEDURAL BACKGROUND

This appeal is from a dismissal based on the pleadings. Our factual discussion thus draws from the complaint. Plaintiffs Amanda Culbertson and Jorge Wong are former employees of the Houston Police Department ("HPD") in Harris County, Texas. Culbertson began working for HPD in 2006 as a criminal specialist in HPD's crime lab. She received her certification as a technical supervisor from the Texas Department of Public Safety. She eventually served as a technical supervisor of HPD's breath alcohol testing program. Wong began working as a criminalist in HPD's crime lab in 2009. He also received certification as a technical supervisor. The plaintiffs' duties included breath alcohol testing and maintaining the instruments used in HPD's Breath Alcohol Testing ("BAT") vans. Both Culbertson and Wong believed that excessive temperatures and electrical problems with the instruments in the BAT vans could affect the integrity of the test results. They informed HPD officials of these concerns, but the problems were not resolved.

In March 2011, due in part to dissatisfaction with the BAT vans, Wong resigned from HPD and began working for Lone Star College. Culbertson resigned effective May 13, 2011, primarily due to her concerns about the BAT vans. She started working for Lone Star the same month. Lone Star was under contract to Harris County to provide technical supervisors to oversee the Harris County Sheriff's Office breath alcohol testing program. The yearly services contract (the "Contract") was to end in the fall but was renewable. Harris County had contracted with Lone Star for nearly thirty years.

The Harris County District Attorney's office subpoenaed Culbertson to testify about a breath alcohol test at a trial set for the week of May 23, 2011. When Culbertson arrived to testify on May 25, she told the assistant district attorney she could testify to the monthly inspection records of the BAT vans

2

and to the fact that the instrument in question worked properly during the inspection she conducted. In Culbertson's actual testimony, however, she would not state that the instrument was working properly the day the defendant took the test. The jury acquitted the defendant.

On June 3, then-Assistant District Attorney Rachel Palmer emailed one of the technical supervisors at Lone Star. She wrote that the DA's Office would not use Culbertson in future Harris County Sheriff's Office breath alcohol testing cases. Palmer drafted a memorandum to the DA Office Bureau Chief on July 11 discussing Culbertson's testimony on May 25. The memorandum stated that "[a]fter this debacle, we realized that she could not be trusted to testify in any breath test." Palmer also stated she was "gravely concerned about [Culbertson's] ability to testify fairly in cases going forward."

On July 26, a meeting was held with representatives from Lone Star, the Harris County Sheriff's Office, and the Harris County Commissioners Court to discuss the renewal of the Contract. The plaintiffs allege that an unwritten agreement was reached to renew the previous year's Contract. The Commissioners Court was to vote to approve the agreement in mid-September.

On July 27, Culbertson was subpoenaed by a defense attorney to testify in a suppression hearing. During the hearing, the defense attorney asked Culbertson about problems with the BAT vans. Culbertson testified that a "big reason" why she and Wong left HPD was because they were not being permitted to maintain the reliability of the equipment in the vans. Palmer, the assistant district attorney on the case, cross-examined Culbertson. During the cross-examination, the plaintiffs allege that Palmer acknowledged Culbertson was a "whistleblower."

Shortly after Culbertson's testimony, Palmer and the DA's Office began investigating Culbertson for perjury. Culbertson hired an attorney.

Culbertson claims that at this time she was told by someone that her technical supervisor certification was in jeopardy. She also contends that Palmer was telling prosecutors in the DA's Office that Culbertson was not credible.

In August, Culbertson met twice with individuals from the DA's Office to discuss concerns raised by her testimony and to explain what she had discussed with the manufacturer of the instruments used in the BAT vans. Palmer was at the second of these meetings. After the meetings, the DA's Office notified attorneys for two criminal defendants of potentially exculpatory or mitigating evidence based on Culbertson's concerns.

Around September 1, 2011, the plaintiffs allege that Palmer met with representatives from both the Harris County Sheriff's Office and the Harris County Commissioners Court. At this meeting, Palmer and the DA's Office recommended that Harris County contract with the Texas Department of Public Safety ("DPS") for breath alcohol testing rather than with Lone Star. Culbertson asserts that then-District Attorney Pat Lykos,[1] Assistant District Attorney Palmer, and the DA's Office sought to discredit Culbertson and Wong so that the Contract would be awarded to DPS instead of Lone Star. These efforts included other private conversations with representatives of the Commissioners Court.

At a September 13 meeting of the Commissioners Court, several defense attorneys expressed their opinion that the Contract between Lone Star and Harris County was ending due to Culbertson and Wong's actions as whistleblowers. During this meeting, one County Commissioner stated publicly that he supported terminating the Contract with Lone Star because

---

[1] The plaintiffs settled with Lykos in her individual capacity, and thus the only individual-capacity allegations that are relevant to this appeal are those that relate to Palmer. We discuss Lykos solely in order to give context for some of the allegations.

the County should not work with someone who takes an adversarial position to the DA's Office. Palmer was present at the meeting.

On September 17, the *Houston Chronicle* newspaper published an article regarding HPD's knowledge of problems with the BAT van program. The article quoted Culbertson and Wong regarding their concerns about the vans. At the end of September, DPS employees removed breath alcohol testing instruments from Lone Star's facilities. At about the same time, DPS sent out proficiency samples to technical supervisors. The samples are used to test a technical supervisor's ability to prepare a prescribed solution. The proficiency samples had to be completed annually to maintain technical supervisor certification. DPS did not send samples to Culbertson or Wong.

On October 1, the *Houston Chronicle* published statements by Culbertson regarding her belief that the DA's Office had retaliated against her, including: "I think they had to make a choice between fixing the problem and silencing me, and it was easier to silence me or anyone else who spoke out."

On October 4, the Harris County Commissioners Court formally approved the budget for Harris County. The budget included a contract with DPS for breath alcohol testing, thus ending the Contract with Lone Star. A spokesman for the Harris County Sheriff's Office stated publicly that his office understood that the DA's Office objected to the procedures or testimony provided by the Lone Star experts. As a result of the loss of the Contract, Lone Star terminated Culbertson and Wong on October 31, 2011.

The plaintiffs filed this lawsuit in December 2012. They claimed a violation of their free speech rights under the First Amendment and sought relief under 42 U.S.C. § 1983. They also brought state law claims. The defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). Palmer also filed to dismiss pursuant to the Texas Citizens

Participation Act ("TCPA").  In August 2013, the district court entered a final order granting those motions.  Palmer then filed for attorneys' fees and sanctions, which were awarded in November 2013.  The plaintiffs separately appealed from both rulings.  We have consolidated the appeals.  The plaintiffs settled with Lykos in her individual capacity, and she has been dismissed.

DISCUSSION

We review a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*.  *Reece v. U.S. Bank Nat'l Ass'n*, 762 F.3d 422, 424 (5th Cir. 2014) (citation omitted).  A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

The plaintiffs arrange their brief in the principal appeal around three large issues with multiple subparts.  They also raise separate issues regarding the award of attorneys' fees, which is the subject of the later, now consolidated, appeal.  We have largely placed our analysis within the plaintiffs' structure, with some reorganization and rephrasing as follows:

I.  The First Amendment retaliation claims

    A.  Public employee and ordinary citizen First Amendment rights

    B.  Applying First Amendment law to the allegations in the complaint

No. 13-20569 c/w 13-20751

C.  Palmer's prosecutorial or qualified immunity

D.  Pleading of municipal liability

II.  Tortious interference claims

III. The Texas Citizen Participation Act ("TCPA")

IV. Procedural issues

A.  Motion for leave to amend

B.  Consideration of matters outside the pleadings

*I. First Amendment Retaliation*

Most, but not all, of the statements that are alleged to have caused the retaliation were made by the plaintiffs after they were no longer employed by HPD.  Liability under Section 1983 for retaliation by the government against private citizens for their statements, and liability for retaliation by governmental employers against public employees for their statements, are subject to different analyses.   Thus, we must identify the category into which these claims should be placed.

*A.  Public employee and ordinary citizen First Amendment rights*

The  general  framework  for  a  First  Amendment  retaliation  claim involving a public employee was articulated by our en banc court this way:

> (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's  speech  involved  a  matter  of  public  concern,  (3)  the plaintiff's  interest  in  speaking  outweighed  the  governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct.

*Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004) (en banc) (citation omitted).

Our *Kinney* en banc opinion has central importance in our review of the district court's decision here.  We were split 9-6 on issues similar to those raised here,

suggesting the legal questions were not easily answered. Close questions they may be, but the answers given to them by the *Kinney* majority bind us now.

Dean Kinney and David Hall were instructors at a police academy operated by Kilgore College in Texas. *Id.* at 340-41. Basic and advanced training for police was offered. *Id.* at 341. The lawsuit had its genesis when Kinney and Hall testified as experts on behalf of the victim's family that police had acted improperly in the fatal shooting of a teenager. *Id.* at 340-41. Several police chiefs notified Kilgore that they objected to instructors testifying against police; some police chiefs indicated they would boycott any Kilgore program in which one of the instructors was either Kinney or Hall, while others refused to attend classes either of them taught. *Id.* at 342-43. At a quarterly meeting of the police association to which these police chiefs belonged, it was agreed those police departments would not send any officers to classes taught by the plaintiffs. *Id.* at 344. Hall resigned to take another job; Kinney stayed for one more contract year, but then his contract was not renewed. *Id.* at 345. Kinney and Hall sued the police chiefs and others, claiming their First Amendment rights were violated. *Id.* at 345-46. As we will discuss in more detail later, we applied the analysis for retaliation against public employees and held the police chief's motion for summary judgment was properly denied. *Id.* at 374.

Similar to an argument made in this case, a dissent found it "absurd to hold that the police chiefs and sheriffs are *not* vested with discretion in choosing which teachers to use (and pay) for [their] training . . . ." *Id.* at 375 (Barksdale, J., dissenting) (emphasis in original). The defendants here argue that the present case is about their discretion to decide whom should be selected (and paid) as witnesses for prosecutions. There is plausibility to such concerns, but the *Kinney* majority rejected them.

8

An important caveat to the framework applied in *Kinney* is that there is no First Amendment protection for the speech at all when public employees make statements as part of their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The First Amendment, though, may still apply when the employees make statements *relating* to their public employment; the question "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014).

We must also discuss governmental contractors. The complaint alleges the plaintiffs made most of their statements while they worked for a college with a contract with the Harris County Sheriff's Office. Claims by governmental contractors that their speech caused retaliation against them by the government are analyzed using the same framework as that for claims by public employees. *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 684-85 (1996). We applied the public-employee framework in *Kinney,* holding that instructors employed by a college that provided training to police were subject to "the requisite governmental power" for that framework to apply. 367 F.3d at 357-58.

If the plaintiffs made statements relevant to their retaliation claims that are not subject to the analysis for public employees, we evaluate those under these requirements applicable to private citizens:

> (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citations omitted).

*B. Applying the law to the allegations in the complaint*

We now turn to assessing the complaint. Culbertson resigned from HPD on May 2, 2011; her final day of work was May 13. Her claims are based on alleged retaliation for testimony she gave in court the week of May 23, other testimony she gave in July, comments she made in a meeting with the DA's Office in August, and comments she made that were published in newspaper articles in September and October. Wong resigned on an unstated day in March 2011. He alleged retaliation due to comments he made to Houston's Chief of Police just before his last day with HPD, and comments he made to his supervisor at the crime lab around the time of his departure and again not long thereafter. Wong was also quoted in the September newspaper article. The complaint refers to Wong when describing Culbertson's July testimony. Culbertson testified that Wong, who was also scheduled to testify at the trial, agreed with her doubts about the accuracy of the BAT equipment. Wong did not actually testify.

In dating the incidents, we interpret the allegations to be that Wong made unfavorable comments about the BAT–van reliability to the Chief of Police just before his HPD employment ended, that Wong's criticism of the BAT vans to a supervisor may have occurred while he was still employed by HPD, that Culbertson made unfavorable comments in testimony after she left HPD but due to work on cases she performed while still employed there, and that she testified Wong felt the same. Finally, a newspaper published statements by them months after their resignations, but the complaint does not state whether they talked to a reporter or comments to others were simply quoted.

The complaint also alleged that both Wong and Culbertson went to work for Lone Star College as technical supervisors on a contract between the college and the Harris County Sheriff's Office. The Contract, which had been in place

for decades, was to provide technical supervisors to oversee Harris County Sheriff's Office's breath alcohol testing program. Wong began work at Lone Star in March 2011, while Culbertson began there in May 2011.

### 1. Pre-termination statements

There is only one clear allegation that opinions expressed while still working for HPD led to retaliation. The claim is based on Wong's conversation with the Chief of Police. Another alleged conversation with a supervisor may also have been pre-departure. We consider these claims first.

We know from *Ceballos*, as refined by *Lane*, that if those conversations were part of Wong's official duties, there is no First Amendment protection. Ceballos, a supervisor in a district attorney's office, doubted the veracity of an affidavit that was used by someone else to gain a search warrant; Ceballos reported his findings to his superiors. *Ceballos*, 547 U.S. at 413-14. Ceballos was called to testify at a hearing. *Id.* at 414-15. He later suffered what he perceived to be retaliation from his superiors. *Id.* The Supreme Court held that there may be First Amendment protection for comments made privately within the employment setting. *Id.* at 420. Ceballos's comments, though, were part of his official duties and were not protected. *Id.* at 421.

Wong does not assert that the statements he made to the Police Chief and the supervisor before leaving HPD was a job duty. The complaint has no direct allegations about job duties, and there was no argument in the district court that such allegations were required. The issue of job duties came up in the motion to dismiss and in the response, as the briefing cited the caselaw whose applicability turns on whether speech was a job duty. The district court's opinion did not rely in its analysis on whether any of the speech was a job duty. Relying thus only on the complaint, we cannot conclude that the pre-

termination statements are unprotected speech performed as part of the plaintiffs' job duties under *Ceballos* or *Lane.*

In assessing the sufficiency of the complaint as to Wong's pre-termination statements, we apply the four factors applicable to analyzing the First Amendment rights of public employees: (1) an adverse employment decision, (2) the speech involved a matter of public concern, (3) the relative balance of the plaintiff's and the governmental defendant's interests, and (4) causation. *Kinney*, 367 F.3d at 356. There is an extra analytical step here, though, because by the time the adverse employment decision was made, Wong was working for Lone Star College. The public employee analysis still applies as Wong worked for a governmental contractor and was sufficiently subject to the indirect effects of the exercise of governmental power. *Id.* at 357-58.

The first factor, the suffering of an adverse employment action, is met by the complaint's allegations that Wong lost his position at Lone Star. The second factor is also satisfied, that Wong's speech about the unreliability of the breath alcohol testing can be considered a matter of public concern. We analogize that speech to the statements in *Kinney* in which it was not even disputed that the testimony about possible improper police conduct was a matter of public concern. *Id.* at 361. We do not at this point apply the third factor of comparing the plaintiffs' interest in speaking to the governmental defendant's interest in promoting efficiency, as the district court should conduct the initial balancing inquiry. It is the final factor, whether protected speech motivated the defendant's conduct, which controls the outcome now. We will address that factor later, after considering some of the other claims.

*2. Post-termination statements*

We now turn to claims based on comments the plaintiffs made after they were no longer employed by HPD. Culbertson claims there was retaliation for

testimony in court in late May and in July. That testimony reasonably appears from the allegations of the complaint to have resulted from work she did while still at HPD, *i.e.,* she was testifying as to BAT results that were determined before she left HPD. The testimony was relevant to whether a criminal defendant should be found guilty. The testimony was not given to someone independently investigating problems with the testing, such as a legislative committee or a grand jury. Testifying as a witness in the prosecution of those who her lab results showed had violated the law had been part of her official HPD duties. There would be no First Amendment protection for the testimony had Culbertson still been employed by HPD because testifying about lab results was one of her job duties. *See Ceballos*, 547 U.S. at 421. Our different question is the applicability of the First Amendment to testimony by former employees about matters lingering from their work.

The pleadings in this case contain no allegation of whether HPD imposed on Culbertson or Wong a continuing duty to testify in cases on which they had worked while still employed. It may be of some importance that plaintiffs were allegedly subpoenaed as witnesses. In considering the range of job duties, we also note the admonition in *Ceballos*, that "excessively broad job descriptions" created by employers could unduly limit First Amendment rights. *Id.* at 424. Determining job duties is meant to be a practical inquiry. *Id.*[2] We conclude that at this stage in the case, that inquiry is premature. We leave the issue open for consideration on remand. Did Culbertson or Wong have a duty, either

---

[2] Harris County argues that because those who have prepared lab reports are necessary witnesses for the introduction of those reports at trial, such testimony is part of the lab employees' duties even after they leave their lab positions. *See Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2716 (2011) (plurality opinion). Confrontation Clause analysis about what witnesses the prosecution must offer at trial is not controlling in First Amendment analysis about the job duties of former public employees who would be those witnesses. *Bullcoming* shows why prosecutors might want such testimony to be a duty, but it does not prove that the post-employment testimony is one.

13

explicit or in some manner implied, arising from their employment to testify about results from their lab work even after they were no longer employed there?  Even if such a duty is found to have existed, does it implicate the need identified in *Ceballos* for "managerial discipline based on an employee's expressions made pursuant to official responsibilities[?]" *Id.* at 424.  Whether the First Amendment protects the testimony is an issue for remand.

Besides the testimony in court, there is a second group of post-employment statements.  Culbertson claimed she suffered retaliation for comments she made in a meeting with the DA's Office in August, months after her resignation, and comments published in a newspaper in September and October.  Wong also made post-employment comments to a supervisor fairly soon after his departure from HPD, and was quoted in a September newspaper article. We cannot tell from the complaint if either plaintiff spoke to a reporter directly or whether comments made to others, including court testimony, were quoted.  From the complaint, it appears at least one of Culbertson's quoted comments was not taken from testimony.  The complaint does not indicate whether any of these statements were made as part of official job duties under the kind of continuing obligation we just applied to post-employment testimony in court.  Thus, the First Amendment potentially will apply.

As private citizens working for a governmental contractor, Culbertson and Wong's claim must be analyzed using public-employee standards.  *See Kinney*, 367 F.3d at 360.  We have already held that losing their positions at Lone Star was an adverse employment action, and the speech about the BAT vans' reliability was a matter of public concern.  Whether the plaintiffs' interest outweighed the governmental ones is a matter initially for the district court. The difficult question is again whether one or more defendants caused injury to the plaintiffs due to the exercise of First Amendment rights.  We earlier

deferred consideration of whether comments Wong made before he left his employment at HPD motivated the cancelling of the Lone Star Contract.   To answer these questions about causation, we need to determine who among the defendants, if any, caused relevant injury, and whether those defendants were motivated by the plaintiffs' exercise of First Amendment rights.

The remaining defendants, after the dismissal of former District Attorney Lykos in her individual capacity, are former Assistant District Attorney Palmer and Harris County.  There are allegations that Palmer was involved in a campaign with Lykos to cause Harris County to drop its contract with Lone Star because of the plaintiffs' criticism of the integrity of BAT results.  The Contract was not renewed, and Lone Star fairly soon terminated the plaintiffs who had been hired to perform work under the Contract.  The question for us is whether causation has been plausibly alleged, *i.e.,* was Harris County's non-renewal of the Contract motivated by the plaintiffs' speech, and if so, did the non-renewal cause the plaintiffs to lose their jobs?

The Harris County Commissioners Court made the decision that led to the loss of the plaintiffs' employment.  We examine that decision.

### *3.  Harris County Commissioners Court*

The decision-maker on non-renewal of the Contract was the Harris County Commissioners Court.  That "court" is actually the principal governing body for a Texas county. TEX. CONST. ART. V, § 18(b).  It is comprised of four commissioners elected from districts and a county judge elected countywide. *Id.* § 15, 18(b).  The Commissioners Court may contract for law enforcement services.  TEX. LOC. GOV'T. CODE § 351.061.  It also approves the budget for the county and may make changes in a proposed budget as it finds warranted by the facts and law.   *Id.* § 111.068.   Neither party disputes that the

Commissioners Court is a final policymaker for Harris County in the area of contracting and budgeting.

If a final policymaker approves a subordinate's recommendation and also the subordinate's reasoning, that approval is considered a ratification chargeable to the municipality. *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). This theory of ratification has been limited to "extreme factual situations." *Id.* (citation and quotation marks omitted).

On appeal, plaintiffs argue that their complaint supports that the Commissioners Court was responsible for retaliation based on its ratification of Lykos's and Palmer's recommendations or because it "rubber-stamped" the recommendations knowing of the motives behind them. Lykos and Palmer allegedly met privately with representatives from the Commissioners Court to discredit the plaintiffs, and recommended to the Commissioners Court that the Contract be awarded to DPS. In a public meeting of the Commissioners Court, one of the Commissioners stated he did not believe Harris County should work with someone who is adversarial to the DA's Office. Three weeks after this meeting, the Commissioners Court approved a budget which provided for the Contract to be awarded to DPS.

Under the theory of ratification, it is not enough that the Commissioners Court approved Palmer's and Lykos's recommendation. A plaintiff "must impute [the defendant's] allegedly improper motives to the board by demonstrating that the board approved both [the defendant's] decision and the basis for it." *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 603 (5th Cir. 2001) (citing *Praprotnik*, 485 U.S. at 127). Beattie was a secretary whose annual contract was not renewed by the school board. *Id.* at 599. She alleged

16

that the superintendent wanted her fired because Beattie had supported the superintendent's opponent in the most recent election. *Id.* On summary judgment, the board members provided affidavits stating they were unaware of Beattie's political activities and had made their decision based on complaints she was rude to teachers, parents, and students. *Id.* at 600. We held that Beattie had not shown causation. *Id.* at 605. There was no evidence the board was even aware of the superintendent's retaliatory purposes. *Id.*

We are at an earlier stage of the proceedings than were the parties in *Beattie.* This case was dismissed on the pleadings. The complaint alleges that there were meetings between Lykos, Palmer, and "representatives" of the Commissioners Court. The complaint refers to newspaper articles setting out the controversies about the BAT vans. The Commissioners, at a public meeting a few weeks before approving the new budget, heard from criminal defense counsel about the controversies, including that the proposal to drop the Lone Star Contract was in retaliation for Culbertson's and Wong's criticisms of HPD's failure to address problems with the BAT vans. There is also an allegation that one Commissioner, at the meeting where defense counsel spoke, stated that he did not think the County should contract with those who took an adversarial position with the DA's Office.

A plausible claim has been stated that the Commissioners knew about the reasons for Lykos's and Palmer's recommendations, and it then ratified them, *i.e.,* it approved the recommendation and the reasoning. Whether evidence developed through discovery or otherwise would support the allegations against the County is unknown. Unlike in *Beattie*, there are no affidavits from the decision-makers.

Even if the Commissioners Court approved the individual defendants' reasoning when it failed to renew the Lone Star Contract, which would support

a finding of ratification, the injury to the plaintiffs was only an indirect result of that decision.  Harris County argues that because it was Lone Star that terminated the plaintiffs' employment, the necessary element of causation is not satisfied.  The plaintiffs allege causation by claiming they had been hired by Lone Star to work on the Contract with the County, with the transfer of the Contract to DPS "resulting in the end of the[ir] employment" In *Kinney,* we rejected an argument that a boycott conducted by police officials of a college's police-training program did not cause the termination of the plaintiffs because their employment was controlled by the college.   367 F.3d at 357-58.  It was enough, we held, that "governmental power [was used] to exert economic pressure on the instructors' employer in order to achieve" the termination of the disfavored instructors; that pressure produced the favored result through indirect means. *Id*. at 358.  We did state that relative attenuation between the governmental action and the adverse consequences suffered by plaintiffs bears on causation, in that it "may be easier for a government official to fire his own employee than to persuade a contractor to fire one of its employees[.]" *Id*.  We conclude here that the separation between cause and effect is sufficiently narrow to satisfy the pleading standard for this suit.

The plaintiffs have alleged enough to survive the motion to dismiss their claims against the County based on the termination of the Lone Star Contract.

*4. Claims against Palmer and Lykos, official and individual capacities*

The plaintiffs have pending claims against former District Attorney Lykos in her official capacity and against former Assistant DA Palmer in her official and individual capacities.

We start with the claim against former District Attorney Lykos in her official capacity. The plaintiffs argue that Harris County is liable under Section

1983 due to the alleged retaliatory campaign Lykos waged against them. The district court in its opinion dismissing the case remarked that the district attorney was a state official. If the court meant she was not an official for which the County could be held responsible, it never explicitly so held. The County does explicitly argue that Lykos acted on behalf of the state, not the County, but cites no authority other than the district court. It matters whether the DA is an official of the County or the state. A lawsuit "against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't. of State Police,* 491 U.S. 58, 71 (1989) (citation omitted). An official-capacity lawsuit is "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citation and quotation marks omitted). When sued in their official capacities, officials "are therefore representing their respective state agencies . . . ." *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 414 (5th Cir. 2004). The division of government in which the official works is responsible for a judgment in an official-capacity lawsuit. The Supreme Court observed that in three of its prior Section 1983 opinions, "we have plainly implied that a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents provided, of course, the public entity received notice and an opportunity to respond. We now make that point explicit." *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985) (footnote omitted).

As noted, we are directed to no authority to support that the DA should be considered a state official and not one for the County. The plaintiffs have cited an opinion of this court that held a county potentially responsible for the conduct of the district attorney for the county. *See Turner v. Upton Cnty.*, 915 F.2d 133, 138 (5th Cir. 1990). The district covered by that prosecutor included

more than one county, but we still held the defendant county potentially liable. *Id.* at 137-38. The issue of whether the district attorney was a county or state official was not discussed and may not have been raised. Still, *Turner* is authority for the proposition that a county can be responsible under Section 1983 for the actions of its district attorney. We will follow *Turner*.

The County can be responsible for actions of a final policymaker who has "the responsibility for making law or setting policy in any given area of a local government's business." *Praprotnik*, 485 U.S. at 125. Exercising discretion in an area of governmental action is not enough. The official must be the one responsible for setting controlling policy:

> The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-83 (1986) (citation and footnote omitted). The Court went on to say that "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84 (citation omitted). Thus, a single decision by a policymaker to follow a course of action can be considered municipal policy.

The question of "'[w]hether a particular official has final policymaking authority is a question of *state law*.'" *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (emphasis in original) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). The plaintiffs argue that Lykos's retaliatory actions "relate to her administrative and managerial duties" and

thus "implicate her role as a final policymaker." In the complaint, the policy is described as one "of retaliation for the exercise of lawful rights."

It should go without saying that no state statute or County directive in any form has given district attorneys authority to retaliate against individuals for exercising their First Amendment rights. Still, we have held that improper conduct by a policymaker can be a policy. In a Section 1983 action, the plaintiff sued a county for the alleged conspiracy of the sheriff and district attorney to subject her to a "sham" trial. *Turner*, 915 F.2d at 134. We held that the "[t]he sheriff's and the district attorney's alleged participation in the conspiracy, if proven, will suffice to impose liability on the county." *Id.* at 137. In doing so, we held that the sheriff was a final policymaker for the county in the area of "preserving the peace in his jurisdiction and arresting all offenders." *Id.* at 136. We did not hold that the district attorney was a final policymaker for any relevant function but held he was a possible co-conspirator for which the county might be liable. *Id.*

In this case, a possible area of policy-making responsibility for a district attorney is to determine what witnesses to use in prosecutions. Arguably, then, Lykos was a final policymaker for purposes of a retaliation campaign to keep public employee or contractor witnesses who testified in an unsatisfactory way from being used in the future. The complaint alleges that the DA's Office decided no longer to use either plaintiff as witnesses. That possible injury – no longer being able to testify – is not the injury we have held is relevant here. Instead, it was the County's failure to renew the Lone Star Contract and the plaintiffs' consequent loss of their employment. Lykos quite clearly was not the final policymaker on that decision. If she were, no campaign would have been necessary to convince the Commissioners Court of anything.

The plaintiffs have not stated a claim against Harris County based on Lykos's actions in her official capacity, as they have not alleged sufficient facts to show Lykos is a final policymaker as to the policy at issue.

The other individual defendant, Palmer, is subject to claims in her official and individual capacities. The plaintiffs allege Harris County is liable for Palmer's actions because Lykos "delegated her policymaking authority to Palmer . . . ." Because we have held that Lykos was not a final policymaker, there was no final authority to delegate to Palmer. To the extent the plaintiffs allege that Palmer herself had undelegated final policymaking authority, we find no legal support for that contention.

The plaintiffs also allege that Harris County is liable pursuant to the "DA's failure to adequately train and supervise assistant district attorneys so as to prevent . . . unlawful retaliatory conduct . . . ." In order to succeed on a failure to train and supervise claim, the plaintiff must plead facts sufficient to show the municipality was "deliberately indifferent" to the obvious need for training and supervision. *Peterson v. City of Fort Worth*, 588 F.3d 838, 849-50 (5th Cir. 2009). It must be "obvious" to the municipality that the alleged unconstitutional conduct was the "highly predictable consequence" of not training or supervising its municipal actors. *Id.*

The plaintiffs have alleged no facts as to the lack of a training program, nor are there sufficient allegations to support a contention that it was obvious to Harris County that the lack of training or supervision would result in the retaliation by prosecutors or others against other public employees or governmental contractors. There would also need to be allegations that the alleged retaliatory conduct occurred with such frequency that Harris County was put on notice that training or supervision was needed. *See id.* at 849-50. No such allegations have been made.

Finally, we address the claims against Palmer in her individual capacity. In *Beattie*, a similar issue was discussed. After this court held that the school board was not liable, we then considered as a separate issue the individual liability of principal Acton and school superintendent Jones who allegedly retaliated against Beattie by recommending her termination. 254 F.3d at 604-05. We noted that the principal and superintendent could not directly cause the adverse decision but only recommend it to the school board. *Id.* at 605. We then stated: "If Acton and Jones did not cause the adverse employment action, they cannot be liable under § 1983, no matter how unconstitutional their motives." *Id.* In context, the court might have been stating that Acton and Jones could be liable if their retaliation for Beattie's exercising her First Amendment rights led to her termination. That is not what happened. The individual defendants' potentially retaliatory motives had been displaced by other motives: "Because the board fired Beattie for permissible, constitutional motives independently of Acton's and Jones's recommendation, that superseding cause shields them from liability." *Id.* We then continued our analysis after finding Acton and Jones had not "caused" the adverse action. *Id.* Beattie argued the connection between the recommendation and the board's action was proven by temporal proximity, but we held that was not enough. *Id.* Our conclusion as to the individual liability of the two officials was that because the ultimate decision was made by the board "independently of these unproven unconstitutional aims, summary judgment was proper." *Id.* We did not necessarily hold that there was no individual liability simply because the board made the decision.

A decision that predates *Beattie* required only that a plaintiff show "an affirmative causal link" between a school principal's recommendation to reassign an athletic director and the school district's decision to do so. *Jett v.*

*Dallas Indep. Sch. Dist.,* 798 F.2d 748, 758 (5th Cir. 1986), *aff'd in part, remanded in part on other grounds*, 491 U.S. 701 (1989).  In *Jett,* it did not matter that the individual defendant had no authority to make the actual transfer decision.  Some later decisions, though, have interpreted *Beattie* to hold that "only final decision-makers may be held liable for First Amendment retaliation under § 1983."  *Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) (citation omitted); *see also Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 350-51 (5th Cir. 2006) (analyzing *Beattie* and holding defendant not liable for First Amendment violation where he was not the final decision-maker).

There is some tension in these precedents.  It can at least be said that before Palmer could be individually liable despite not being the final decision-maker, it must be shown that her recommendation was made in retaliation for constitutionally protected speech and was the reason the adverse employment decision was made by the final decision-maker.  A "superseding cause" would shield Palmer from liability.  *Beattie*, 254 F.3d at 605.  Discovery may provide evidence of the Commissioner's motivations.  If so, then how, if at all, Palmer's actions impacted the decision might be better understood.

The plaintiffs also rely on Palmer's other retaliatory actions, such as discrediting them as technical supervisors, harming their reputations, threatening their licensing as technical supervisors and investigating Culbertson for perjury.  Harm to reputations sounds in defamation. The plaintiffs have presented little in their briefing to assist us in understanding these claims as brought under the First Amendment.  The claims here are similar to those in one of our precedents where we held that false accusations and investigations that do not lead to arrest or indictment are not actionable under the First Amendment.  *Colson v. Grohman,* 174 F.3d 498, 511-12 (5th Cir. 1999).  Statements by a public official that place a stigma on an

24

individual's reputation are not actionable without more. *Paul v. Davis,* 424 U.S. 693, 710-11 (1976). This court has interpreted *Paul* to require a showing – an allegation at this stage – of the stigmatizing public statements and "an infringement of some other interest." *Breaux v. City of Garland*, 205 F.3d 150, 158 n.14 (5th Cir. 2000) (citations and quotation marks omitted). The plaintiffs' briefs on appeal do not explore the constitutional dimensions of this claim with any degree of clarity, and do not cite *Paul, Breaux,* or related caselaw. Instead, their arguments on these other events are primarily discussed as state-law tortious interference claims. That is where we will place our analysis of them later in the opinion. The First Amendment claims based on asserted injuries other than the decision by the Commissioners Court not to renew the Contract with Lone Star were properly dismissed.

As of this point in our analysis, then, the plaintiffs' claims against Palmer based on some of the statements they made after they had left employment at HPD and Wong's statement just before leaving, have satisfied the test for retaliation by the government based on public-employee speech. An open question on remand is whether Culbertson's testimony made as a former employee is relevant in the analysis. We next turn to immunity.

*C. Palmer's prosecutorial or qualified immunity*

In the district court, Palmer raised the defenses of absolute prosecutorial immunity and qualified immunity. Though these arguments were briefed in the district court, the court did not rule on them in light of the dismissal of the claims on other grounds. On appeal, the arguments have again been briefed. We may consider arguments not ruled upon by the district court so long as they were raised below. *See Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014).

Prosecutors enjoy absolute immunity from suit for performing actions associated with the judicial process. *Imbler v. Pachtman*, 424 U.S. 409, 427,

430 (1976). This immunity arises from the public interest in shielding prosecutors from liability so they may exercise independent judgment when deciding which suits to bring and how to present them in court. *See Kalina v. Fletcher*, 522 U.S. 118, 125 (1997). Actions that are performed by the prosecutor merely in an investigatory capacity, however, similar to the actions of other law enforcement officers, are only entitled to qualified immunity. *Id.* Palmer's actions here are not the most obvious fit for absolute prosecutorial immunity. We see no reason to resolve the issue, though, because we agree with Palmer's alternative arguments about qualified immunity.

Qualified-immunity analysis requires that we "determine whether the plaintiff has suffered a violation of his constitutional rights and, if so, whether a reasonable official should have known that he was violating the plaintiff's constitutional rights." *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005) (citation omitted). We have held there is enough in the complaint to support the claim that Palmer's actions violated the plaintiffs' constitutional rights to survive a motion to dismiss. Even if that is so, Palmer argues she is entitled to qualified immunity because, in light of *Beattie*, the law was not clearly established that a mere recommendation of termination to a higher authority who makes the final decision causes an adverse employment action.

We have already noted ambiguity as to the liability of a person for recommending an adverse employment decision. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims,* 134 S. Ct. 3, 4-5 (2013) (citation and quotation marks omitted). It was unsettled at the time of Palmer's actions, and remains so now, whether someone who is not a final decision-maker and makes a recommendation that leads to the plaintiff

26

being harmed can be liable for retaliation under Section 1983. *Cf. Beattie,* 254 F.3d at 595, 604-05; *Jett,* 798 F.2d at 758; *Johnson,* 369 F.3d at 831. In fact, some clear statements in the caselaw have held there can be no liability. *E.g., Whiting,* 451 F.3d at 351.

We conclude the claims against Palmer should be dismissed based on qualified immunity.

### D. *Pleading of municipal liability*

In addition to the claim against Harris County based on the decision by the Commissioners Court to cancel the Lone Star Contract, Culbertson and Wong also argue that the County is liable for retaliation because of a *de facto* policy or custom of retaliation for the exercise of First Amendment rights.

For municipal liability to arise under Section 1983 from actions by officials that caused a deprivation of the constitutional rights of others, there must be shown "a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)). A municipality's liability is "based on causation rather than *respondeat superior.*" *Bolton v. City of Dallas, Tex.,* 541 F.3d 545, 548 (5th Cir. 2008) (citing *Monell,* 436 U.S. at 692). "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski,* 237 F.3d at 578 (citations and footnotes omitted).

We have already held that the district attorney was not a final policy-maker for the claimed policy here. A policy, though, may be officially promulgated by the governing body, by an official to which policy-making

authority has been properly delegated, or by officials or employees of the municipality through a "persistent, widespread practice" that is "so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984).

The claimed *de facto* policy of retaliation, plaintiffs allege, can be inferred from the number of individuals in the DA's Office who participated in the campaign against them and the "very public nature" of the campaign.  The plaintiffs also alleged in the complaint that during the grand jury investigation into the BAT vans, Lykos investigated members of the grand jury and of the prosecutors who conducted the grand jury investigation.  Such an act is said also to reflect a policy of retribution.

The plaintiffs' complaint falls short of alleging that Harris County had a "persistent, widespread practice" of retaliation for the exercise of First Amendment rights.  In one of our precedents, the plaintiff brought a Section 1983 action against a city alleging officers used excessive force when arresting him.  *Peterson,* 588 F.3d at 842.  Because there was no written policy in place, the plaintiff argued there was a widespread practice of excessive force that established a *de facto* policy of the city.  *Id.* at 850.  The plaintiff claimed there were 27 prior incidents of excessive force over the course of three years.  *Id.* We noted that the legal question presented was "whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy."  *Id.*  We held the prior incidents insufficient.  *Id*. at 851.  In doing so, we noted that a pattern requires "sufficiently numerous prior incidents as opposed to isolated instances."  *Id.* (citation and quotation marks omitted).

Here, the plaintiffs allege there was a retaliatory campaign against them and a retaliatory investigation against the grand jury and its prosecutors, all

arising from the same predicate events. The retaliatory campaign against them was publicly known, but they offered no evidence that similar retaliation had victimized others. There was, in other words, no allegation of a "widespread practice" of retaliation that is "so common and well settled" as to constitute the policy of Harris County. *See Webster*, 735 F.2d at 853.

The allegations in this case are limited to the events surrounding the plaintiffs. That is not an allegation of a *de facto* policy of retaliation by the County. Harris County's potential liability rests solely on the actions of the Commissioners Court in cancelling the Lone Star Contract.

## II. Tortious interference claims

The district court dismissed the plaintiffs' claims against the individual defendants for tortious interference with a contract and tortious interference with prospective contractual relations under the TCPA.

The district court then held that, regardless of the TCPA, Culbertson and Wong failed to state a claim against Palmer under Rule 12(b)(6) as to either tortious interference claim. The court in effect held the complaint alleged nothing to support interference. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citation and quotation marks omitted). Neither in the district court nor here has Palmer presented an argument with supporting authority regarding immunity as to these state-law claims, so we do not consider that question.

Culbertson and Wong claim that Palmer was a leader in the effort to award the Contract to DPS rather than Lone Star and that her actions constitute tortious interference. The plaintiffs do not claim that Palmer tortiously interfered with the Contract between Lone Star and Harris County.

Instead, they claim Palmer interfered with their employment contract with Lone Star and that her interference caused their termination.

The Texas Supreme Court has identified the elements of a tortious interference with an existing contract as: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (citation omitted).   There was an existing contract here.  The second through fourth elements are at issue.

On the second factor, the Texas Supreme Court has held that "[i]nterference with contract is tortious only if it is intentional." *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992) (citations omitted).  Intent requires that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id.* (citation and quotation marks omitted).  The defendants argue that Lone Star's termination of the plaintiffs' employment may have been inevitable once the Contract with the County was lost, but the intent of the defendants' campaign was limited to cancelling Lone Star's Contract. Palmer cites a state intermediate appeals court decision to support the argument. *See Mabry v. Sam's E., Inc.*, No. 05-05-00170-CV, 2006 WL 2348953 (Tex. App.–Dallas Aug. 15, 2006, no pet.)  Plaintiff Mabry, a customer service technician for Southwestern Bell Telephone, took an item from Sam's Club, without paying, while on a lunch break from work. *Id.* at *1.  He was confronted by a Sam's Club employee. *Id.*  Upset with the way he was treated, Mabry returned to Sam's Club several days later to complain. *Id.*  One of Sam's Club's employees called Southwestern Bell to report Mabry's conduct; Mabry was fired. *Id.* at *2.  Mabry sued Sam's Club for tortious interference with his

employment contract. *Id.* The appellate court affirmed the summary judgment because "Mabry had to show that Sam's [Club and its employee] intended to cause the ultimate outcome – Mabry's termination of employment . . . ." *Id.* at *5. (citing *John Carlo*, 843 S.W.2d at 472). The court was "unable to find any evidence that [the defendants] had an intent to cause Mabry to lose his job," and held that the grant of summary judgment was proper. *Id.*

*Mabry* is a poor fit. The allegations in the complaint in this case make a plausible case that Palmer intended to have the Contract with Lone Star canceled, and as alleged, that the interference "was the proximate cause" of the plaintiffs' loss of their jobs. As we quoted above, the Texas standard for the intent needed for tortious interference is that a defendant "desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *John Carlo,* 843 S.W.2d at 472 (citation and quotation marks omitted). The plaintiffs allege that the defendants' "purpose" was "to harm, discredit, and end the employment of Culbertson and Wong, in part by transferring the Contract from Lone Star to DPS . . . ." We discover more than mere conclusory allegations in the complaint that Palmer had the necessary intent because she would have known that the consequence of cancellation of a contract that the plaintiffs had been hired to work on would quite likely be that those new hires would lose their jobs. These claims were not "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

As to the third prong of a tortious interference with contract claim, Culbertson and Wong must establish Palmer proximately caused their termination. "The test for cause in fact is whether the defendant's conduct was a substantial factor in bringing about the injury without which the harm would not have occurred." *Fin. Review Servs., Inc. v. Prudential Ins. Co. of Am.*, 50

S.W.3d 495, 509 (Tex. App.—Houston [14th Dist.]1998), *aff'd*, 29 S.W.3d 74 (Tex. 2000). The district court held that the plaintiffs "have no plausible causal chain." The court considered that "[b]oth the Commissioners Court and [Lone Star] College were independent actors who could have decided differently." That is true, but the complaint alleges that Palmer pursued a goal of having the Commissioners Court cancel the Contract, which it did, and the complaint also supports that Lone Star's losing the Contract would lead to the plaintiffs losing their jobs. We have already held this to be sufficient causation for the Section 1983 claim. We find the same to be true here. The plaintiffs have sufficiently alleged that Palmer's conduct was a "substantial factor in bringing about" their termination from Lone Star "without which the harm would not have occurred." *See id.*

Because the plaintiffs' complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," we find there is a sufficient claim against Palmer for tortious interference with the plaintiffs' employment contract with Lone Star. *Iqbal*, 556 U.S. at 678 (citation and quotation marks omitted).

The plaintiffs next argue that Palmer tortiously interfered with their prospective contractual relations. In order to prevail on such a claim, a plaintiff must show:

> (1) there was a reasonable probability that the parties would have entered into a contractual relationship; (2) the defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Brown v. Swett Crawford of Tex., Inc.*, 178 S.W.3d 373, 381-82 (Tex. App.—Houston [1st. Dist.] 2005, no pet.) (citation omitted).

The central problem with this claim is that the plaintiffs do not allege facts to support the contention that Palmer's conduct proximately caused the plaintiffs' inability to find employment.[3]  The plaintiffs do not allege that Palmer contacted any prospective employers regarding employing either of them.  In fact, there are no facts in the complaint as to Palmer interfering with any specific prospective business relationship that, but for the alleged interference, would have been reasonably probable.

Accordingly, the plaintiffs have failed to state a claim for tortious interference with prospective contractual relations.

*III. Texas Citizen's Participation Act*

The TCPA provides an expedited means for dismissing lawsuits that involve the exercise of certain constitutional rights, including free speech. *Pickens v. Cordia,* 433 S.W.3d 179, 181 (Tex. App.—Dallas 2014, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 27.001-011).   In determining whether a legal action should be dismissed, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE ANN. § 27.006(a).  To prevail on a motion to dismiss under the TCPA, the movant must show by a preponderance of the evidence that the action is "based on, relates to, or is in response to, the party's exercise of the right of free speech; the right to petition; or the right of association." *Id.* § 27.005(b)(1)-(3).  Other procedures then apply

---

[3] The plaintiffs do allege that DPS failed to send them proficiency samples (in order to maintain their technical supervisor certification), but they do not allege that this was at the direction of Palmer.

if the movant shows that the action is based on, as is relevant here, the exercise of free speech rights.

We have not specifically held that the TCPA applies in federal court; at most we have assumed without deciding its applicability. *See, e.g., NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 753 (5th Cir. 2014).[4] Because we determine that the TCPA by its own terms has not been shown to apply, we again pretermit the fundamental issue of its applicability in federal court.

Palmer, as the party moving to dismiss, bears the initial burden. The plaintiffs argue that Palmer did not meet that burden as her motion "did not offer *any* evidence showing that she engaged in activity protected by the TCPA." Instead, "her motion relied exclusively on the allegations in Plaintiffs' complaint." The allegations are that Palmer recommended to the Commissioners Court that it award the Contract to DPS rather than Lone Star, she stated at a meeting with representatives of the Commissioners Court that the plaintiffs could not be trusted, and she had private conversations with representatives of the Commissioners Court regarding the plaintiffs. Palmer does not admit to any of this speech, though she also does not deny it.

Several recent Texas appellate court cases, none from the state's highest court, conclude the TCPA does not apply if the defendant denies making the communication at issue. For example, "a defendant who denies making any communication may not obtain dismissal by also simultaneously claiming that he was exercising his right of free speech by making a communication." *Rauhauser v. McGibney*, No. 02-14-00215-CV, 2014 WL 6996819 at *5 (Tex.

---

[4] After oral argument in this matter, the D.C. Circuit declined to apply an Anti-SLAPP statute's motion-to-dismiss provision on the ground that it conflicts with Federal Rules of Civil Procedure 12 and 56. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1337 (D.C. Cir. 2015). Other circuits have applied state Anti-SLAPP statutes' pretrial dismissal provisions. *See, e.g., Godin v. Schencks*, 629 F.3d 79, 81, 92 (1st Cir. 2010); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999).

App.—Fort Worth Dec. 11, 2014, no pet.) (citation omitted). In another opinion, a different state appellate court held that because the defendant "has denied sending the email, we conclude [the TCPA] does not apply to this cause of action." *Pickens*, 433 S.W.3d at 188. The TCPA was similarly held to be inapplicable in another case when the defendant "claim[ed] that she did not publish any of the defamatory posts[.]" *Am. Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865, 882 n.5 (Tex. App.—Dallas July 1, 2014, no pet.)

Though these decisions are not from the state's highest court, we conclude they are persuasive. The *Pickens* opinion explains that the motion to dismiss process under the TCPA "is premised on the notion that one purpose of [the TCPA] is to 'encourage and safeguard the constitutional rights of persons to speak freely.'" *Pickens,* 433 S.W.3d at 188 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 27.002). Accordingly, "[g]iven that [the defendant] has denied sending the email, we conclude [the TCPA] does not apply to this cause of action." *Id.*

The only evidence Palmer offers to show the plaintiffs' lawsuit is based on TCPA-protected activity is allegations from the plaintiffs' own complaint that Palmer engaged in speech. Palmer does not admit making the relevant statements. Palmer has not cited any Texas case that specifically holds that a plaintiff's own allegations will by themselves satisfy a defendant's burden under the TCPA. We will not create such law.[5]

Accordingly, the district court erred in dismissing the plaintiffs' suit pursuant to the TCPA. The district court later awarded attorneys' fees, as the TCPA says it must do: "If the court orders dismissal . . . the court shall award

---

[5] Palmer cites two Texas cases, but in neither did the court hold that allegations in a complaint are sufficient to satisfy a TCPA movant's burden to show that the plaintiff's suit is based on free speech. *See James v. Calkins*, 446 S.W.3d 135, 147-48 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014, pet. filed); *Schimmel v. McGregor*, 438 S.W.3d 847, 859 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

to the moving party . . . court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require." TEX. CIV. PRAC. & REM. ANN. CODE § 27.009(a)(1). Because the district court erred in granting Palmer's motion to dismiss under the TCPA, attorneys' fees under that act were not available to Palmer.   The district court's order granting attorneys' fees must be reversed.

## IV.  *Procedural Issues*

The plaintiffs argue that the district court's dismissal under Rule 12(b)(6) without granting their request to amend their complaint warrants reversing the order of dismissal.  Because we are reversing the district court's ruling in part, we consider this procedural issue to be moot.  The plaintiffs also argue that the district court may have relied on matters outside the pleadings in granting the defendants' Rule 12(b)(6) motions.  We do not rely on anything outside the pleadings as to the dismissals we have affirmed.  Our reversal of the dismissal of the other claims moots the remainder of the issue.

## CONCLUSION

The dismissal of Culbertson and Wong's claims against Harris County that it ratified Palmer's and Lykos's alleged retaliatory campaign is REVERSED.  The dismissal of the tortious interference with a contract claim is REVERSED.  The dismissal of claims due to the TCPA is REVERSED, and the award of attorneys' fees is REVERSED.  In all other respects, including the dismissal of retaliation claims against Palmer in her individual capacity, the judgment of the district court is AFFIRMED.  The case is REMANDED for further proceedings.