**Reversed and Rendered in Part, Affirmed as Modified in Part, Remanded, and Opinion Filed February 6, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-17-00732-CV

---

## HARRIS COUNTY, TEXAS AND KEVIN VAILES, Appellants

## V.

## BARBARA COATS, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF JAMAIL AMRON, DECEASED, AND AS HEIR TO THE ESTATE OF JAMAIL AMRON, DECEASED; AND ALI AMRON, INDIVIDUALLY AND AS HEIR TO THE ESTATE OF JAMAIL AMRON, DECEASED, Appellees

**On Appeal from the 80th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-55551**

---

## O P I N I O N

In this civil rights action, a Texas county and a deputy constable appeal a judgment following a jury verdict awarding wrongful death and survival damages. Appellees and plaintiffs below, Barbara Coats and Ali Amron, asserted a section

1983 claim against Harris County and Harris County Constable Precinct Four Deputy Kevin Vailes, alleging that the defendants' unconstitutional conduct caused the death of appellees' son, Jamail Amron. A jury found that Deputy Vailes violated Jamail's Fourth Amendment rights to be free from excessive force and unreasonable seizure. The jury also answered in appellees' favor a series of questions submitted to establish Harris County's liability under 42 U.S.C. section 1983 and *Monell*.[1] The jury awarded (a) $1,000,000 in survival damages, (b) $10,000,000 in damages resulting from Jamail's death, and (c) $5,000 in exemplary damages against Deputy Vailes. The jury apportioned responsibility for Jamail's death 60% to Harris County, 20% to Deputy Vailes, and 20% to Jamail.

Harris County and Deputy Vailes seek reversal and rendition of judgment, in whole or in part, or a new trial. Appellees raise a cross-issue challenging the trial court's decision to reduce their recovery of survival damages by 20% because the jury was not asked to apportion responsibility for Jamail's pain and anguish.

For reasons explained below, we hold the following.

1.  Appellees did not establish that Deputy Vailes's constitutional violations found by the jury were inflicted pursuant to an act or decision of a Harris County final policymaker responsible for the area of county business at issue. Thus, Harris County is not liable under section 1983 for any damages.

2.  Legally and factually sufficient evidence supports the jury's findings that Deputy Vailes violated Jamail's constitutional rights to be free from excessive force.

---

[1] *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).

3.   Deputy Vailes is not entitled to qualified immunity from the excessive force claim.

4.   Appellees did not present legally sufficient evidence that Deputy Vailes's constitutional violations found by the jury caused Jamail's death.   Thus, Deputy Vailes is not liable under section 1983 for wrongful death damages.

5.   Deputy Vailes's jury charge error complaint does not entitle him to a new trial because any error is harmless.

6.   Legally sufficient evidence supports the exemplary damage award against Deputy Vailes.

7.   Based on this jury charge, the trial court erred in reducing appellees' recovery for pain and mental anguish damages by 20%.

We reverse the judgment against Harris County and render judgment that appellees take nothing from Harris County.  We reverse the portion of the judgment awarding wrongful death damages to appellees and render judgment that appellees take nothing from Deputy Vailes for damages resulting from Jamail's death.  We modify the portion of the judgment awarding pain and mental anguish damages to provide that Coats, as personal representative of Jamail's estate, recover from Deputy Vailes $1,000,000 awarded by the jury for those damages, and we affirm as modified that part of the judgment.  We additionally affirm the portion of the judgment awarding appellees $5,000 in exemplary damages against Deputy Vailes.  Finally, in light of the reduction in damages, we remand the attorney's fee award to the trial court for redetermination.  *See* Tex. R. App. P. 43.3.

3

## Background

In September 2010, Jamail and his girlfriend were using cocaine in her apartment when he began feeling ill. Worried that the cocaine was "bad," Jamail left the apartment through a bedroom window to call for help. At 1:40 a.m., he called 911 from a public phone located on the apartment complex property. He told the operator that he had taken too many muscle relaxers and was having difficulty breathing. The operator dispatched an ambulance with two emergency medical technicians ("EMTs"), Sean Richardson and William May, for an "unknown possible drug overdose." For safety purposes, the operator placed a call for police back-up and instructed the EMTs to wait for law enforcement to arrive.

As the EMTs waited near the apartment complex, Richardson saw Jamail climb the fence and approach the ambulance, where Richardson spoke with him. Richardson described Jamail as distressed, extremely anxious, sweating, and hyperventilating. Jamail asked if the EMTs were there to help him. Jamail told Richardson that he had taken cocaine, that he thought there was "something in" it, and that he was afraid he would die. Richardson asked Jamail to allow an examination in the ambulance, but Jamail refused and ran toward a nearby Burger King restaurant.

The parties' descriptions of subsequent events vary significantly. Appellees' trial evidence centered on the testimony of Cindy Lansdale, a Burger King assistant manager working that night. As Lansdale closed out cash registers, she heard someone bang on a window. Outside she saw Jamail, wearing only shorts and a shirt. Jamail said he did not feel good and asked for a cup of water. She directed Jamail to the drive-through window. Lansdale described Jamail as hyperventilating, but he was otherwise calm, kind, respectful, and clear-spoken. Lansdale gave Jamail

4

a cup of water, which he drank while sitting on the ground near the drive-through window. He asked Lansdale to keep an eye on him because he did not feel well.

Meanwhile, Harris County Precinct Four Deputy Bryan Saintes responded to the call for back-up and arrived on the scene. Deputy Saintes spoke with the EMTs, who told him that Jamail ran to the Burger King. Watching events from inside the drive-through window, Lansdale saw Deputy Saintes drive to the restaurant and park his vehicle ten to twelve feet from the window. Deputy Saintes cuffed Jamail's hands behind his back and walked him toward the ambulance. Jamail did not resist, but Lansdale heard him say, "I didn't do anything." Within two minutes after they reached the rear of the ambulance, Jamail became combative, broke away, and, hands still cuffed, ran back toward the drive-through window. Deputy Saintes pursued Jamail, and the two struggled as the deputy attempted to hold Jamail against the driver's side of the patrol vehicle. At that time, Precinct Four Deputies Jason Reese and Kevin Vailes, as well as Precinct Four Corporal Mary Haver, arrived as back-up, and they immediately assisted Deputy Saintes in the struggle. Shortly, all four officers were holding Jamail against the vehicle.

Lansdale then saw Richardson approach and stand next to Deputy Saintes. As an officer held Jamail, Richardson gave Jamail an injection in his shoulder. Jamail immediately collapsed into the officer's arms and fell to the ground, where he laid on his back with his eyes closed. Lansdale saw Deputy Reese place his foot on Jamail's calf muscles, while Corporal Haver "kick-tapped" his body as if she was "checking his body functions." Meanwhile, as Lansdale described, Deputy Vailes placed his police boot across Jamail's nostrils and mouth and pressed down with enough force so "that the arch of the neck was going flat along with the asphalt."[2]

---

[2] Another Burger King worker said in a written statement that one of the officers "placed his foot on [Jamail's] face."

5

While Jamail was on the ground, Lansdale did not hear him make noises or see him move, and his eyes were closed. Lansdale walked away from the drive-through window for about two to five minutes. When she returned to the window and looked out, she again saw Deputy Vailes's boot over Jamail's nose and mouth. Lansdale then stepped away from the window for approximately fifteen to twenty minutes. Lansdale saw no further interactions between Jamail, the deputies, and the EMTs. When she returned to the window a third time, Jamail was gone.

The officers and EMTs, for their part, generally agreed that Deputy Saintes was struggling to restrain Jamail when Deputies Reese and Vailes arrived at the scene, and that the group forced Jamail to the ground. Deputy Vailes denied that he placed his boot over Jamail's nose and mouth. Deputy Vailes said that he placed his knee, and then his foot, beside Jamail's head and put his hand on Jamail's forehead because—in contrast to Lansdale's description that Jamail appeared to be "dead or in a coma"—Jamail was banging his head and thrusting his torso up while trying to kick, spit, and bite the medical personnel and the deputies. While Jamail was restrained on the ground, Richardson said he administered two milligrams of a sedative, Versed. Because Jamail continued to struggle, Richardson administered a second two milligram dose of Versed, and Jamail "settled down" a few seconds later.

Deputy Vailes walked to his patrol vehicle, while the other deputies and EMTs rolled Jamail on his side and added extra sets of handcuffs so they could place a backboard behind him. At that time, Jamail was seen "breathing heavily." Richardson, May, and Deputy Reese noted that Jamail was breathing when they rolled him to his side.[3] Deputy Reese also heard Jamail making noises. May described Jamail as "very calm and breathing normally." After the backboard was

---

[3] Richardson stated that Jamail had an "open airway," and Richardson watched "the rise and fall of his chest."

in place, the deputies and the EMTs lifted Jamail onto a stretcher. Then, Deputy Reese commented that Jamail looked pale and asked the EMTs if Jamail was breathing. One of the EMTs checked and said he was. Corporal Haver noticed that Jamail's breathing was shallow. She also asked the EMTs if Jamail's breathing was okay, and the EMT told her that the sedative they administered had taken effect. At Deputy Reese's request, an EMT checked Jamail's airway and said it was "good." After Jamail was placed on the stretcher and while being wheeled toward the ambulance, Richardson heard "snoring respirations" and observed that Jamail had "turned pale and was presenting with agonal respirations which are deep, labored respirations." May agreed that they "may have a problem." By the time the EMTs reached the ambulance, Richardson noticed that Jamail had stopped breathing; when he checked for a pulse, he could not find one and "identified that [Jamail] was in cardiac arrest at that time." The EMTs suctioned a small amount of "emesis" from his mouth, performed CPR on him, and transported him to a nearby hospital. Efforts to resuscitate Jamail proved unsuccessful, and he was pronounced dead at the hospital. After an investigation, the Harris County Sheriff's Office ruled Jamail's death accidental.

None of the deputies recorded any part of the encounter and no nearby security camera video was introduced.

Jamail's parents, individually and as representatives and heirs of Jamail's estate, filed the present suit against Richardson, Mays, Cypress Creek Emergency Medical Services (Richardson's and May's employer), Deputies Vailes, Saintes, and Reese, Corporal Haver, Harris County Precinct Four Constable's Office, and Harris County. Appellees alleged that the defendants violated Jamail's constitutional rights

7

and sought recovery under section 1983. *See* 42 U.S.C. § 1983.[4] Appellees' central allegation was that Deputy Vailes suffocated Jamail with his boot. The EMTs and Cypress Creek settled before trial. The trial court dismissed on qualified immunity grounds all claims against the law-enforcement defendants other than Deputy Vailes, and the court dismissed the Precinct Four Constable's Office on jurisdictional grounds. At the time of trial in April 2017, only Deputy Vailes and Harris County remained as defendants.

After a three-week trial, the jury returned a verdict against Deputy Vailes and Harris County. The jury found that Jamail sustained an injury resulting directly from Deputy Vailes's use of excessive force that was objectively unreasonable, and that Deputy Vailes unreasonably seized Jamail. As to Harris County, the jury found that:

(a) a final policymaker for the county acted with deliberate indifference to a policy that was the moving force behind the violation of Jamail's constitutional rights to be free from excessive force and unreasonable seizure;

(b) at the relevant time, Harris County Constable Precinct Four had a verbal policy that prohibited an officer from using his or her feet as a form of use of force unless the life of the officer is threatened;

(c) a final policymaker for the county acted with deliberate indifference to the verbal policy regarding use of feet and that such policy was the moving force behind the violation of Jamail's constitutional rights to be free from excessive force and unreasonable seizure;

(d) a final policymaker for the county failed to train law enforcement officers adequately and was deliberately indifferent to the consequences of such

---

[4] Section 1983 provides a private right of action in tort against persons acting under color of state law who violate rights secured by federal law. *See* 42 U.S.C. § 1983.

8

failure;

(e) a final policymaker for the county failed to supervise law enforcement officers adequately and was deliberately indifferent to the consequences of such failure; and

(f) a final policymaker for the county ratified Deputy Vailes's conduct that violated Jamail's constitutional rights to be free from excessive force and unreasonable seizure.

The jury awarded appellees $1,000,000 for Jamail's pain and mental anguish; $10,000,000 resulting from Jamail's death; and $5,000 in exemplary damages against Deputy Vailes. In apportionment questions relating to the death damages only, the jury apportioned 60% fault for Jamail's death to Harris County, 20% to Deputy Vailes, and 20% to Jamail. The trial court signed a judgment based on the verdict, except the court reduced appellees' recovery for Jamail's pre-death pain and mental anguish by 20%. The judgment grants appellees recovery of 20% of all compensatory damages against Deputy Vailes and Harris County jointly and severally, plus an additional sum equal to 60% of all compensatory damages against Harris County only, plus exemplary damages against Deputy Vailes, plus attorneys' fees under 42 U.S.C. § 1988.[5]

## Issues Presented

In its first two issues, Harris County challenges its section 1983 liability on several grounds. Most stem from the basic premise that appellees' damages did not result from constitutionally deficient policies adopted by a county official vested with, or to whom was delegated, final policymaking authority for Harris County as to law enforcement. In its third issue, the county argues that it did not cause Jamail's

---

[5] All damages against Deputy Vailes are in his individual capacity.

9

death. Finally, the county challenges the legal and factual sufficiency of the evidence supporting the jury's finding that the county is 60% at fault for Jamail's death.

Deputy Vailes contends that: (1) the evidence is legally and factually insufficient to support the jury's findings that he used excessive force or unreasonably and intentionally seized Jamail; (2) he is entitled to qualified immunity as a matter of law; (3) the trial court erred in denying his motions to modify or reform the judgment or grant a new trial; (4) appellees presented no evidence that Jamail died of suffocation rather than acute cocaine toxicity; (5) the trial court improperly charged the jury on unreasonable seizure because that question was effectively a double submission of excessive force; and (6) the punitive damages award is not supported by legally or factually sufficient evidence.

In a single cross-issue, appellees contend that the trial court erred in reducing Jamail's survival damages based on the proportionate responsibility findings because those findings applied only to the death damages, and the jury was not asked to apportion responsibility for survival damages.

**Analysis**

Title 42 U.S.C. section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983. We apply federal substantive law and state procedural law when reviewing a claim brought under a federal statute. *In re GlobalSanteFe Corp.*, 275

10

S.W.3d 477, 485 (Tex. 2008). The federal statute at issue, section 1983, is "not a source of substantive rights" but creates a cause of action against state actors to enforce those rights. *Escobar v. Harris County*, 442 S.W.3d 621, 629 (Tex. App.— Houston [1st Dist.] 2014, no pet.) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994)). A section 1983 claimant must show that a person acting under color of state law deprived the claimant of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 331-32 (1986). Individual government actors and, in certain circumstances, local governments can be "persons" subject to section 1983 liability. *See Howlett v. Rose*, 496 U.S. 356, 375 (1990); *Monell*, 436 U.S. at 694. Appellees secured a judgment under section 1983 against both Harris County and Deputy Vailes. We first consider the county's arguments.

## A. Harris County

### 1. *Local government liability under section 1983*

The Supreme Court held in *Monell* that a local government is liable under section 1983 for its policies that cause constitutional torts. *Monell*, 436 U.S. at 694; *see also McMillian v. Monroe County*, 520 U.S. 781, 784-85 (1997). For liability to attach, a local government must *itself* subject a person to a deprivation of rights or cause a person to be subjected to such a deprivation through official action or imprimatur. *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011); *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (local governments responsible only for "their own illegal acts"); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Isolated unconstitutional actions by local government employees will almost never trigger employer liability because local government employers are not vicariously

liable under section 1983 for their employees' unconstitutional or illegal acts. *See Monell*, 436 U.S. at 691; *Piotrowski*, 237 F.3d at 578.

To establish local government liability under section 1983, a claimant must prove three critical elements: an official policy, promulgated by the local government unit's policymaker, that was the "moving force" behind the violation. *See Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015); *Piotrowski*, 237 F.3d at 578 (citing *Monell*, 436 U.S. at 694). These three principles are "necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski*, 237 F.3d at 578. Generally speaking, for instance, when a municipal official follows or executes an unconstitutional municipal policy and thereby causes injury, section 1983 municipal liability may result; whereas, when a municipal official causes injury by violating a person's constitutional rights, but does so contrary to a constitutional municipal policy, section 1983 municipal liability will rarely if ever result. The former circumstance illustrates the local government's acts; the latter illustrates only the employee's.

An official government policy can be proven in more than one way. It includes: (1) official decisions promulgated by a local government's lawmaking body; (2) longstanding practices so persistent and widespread as to fairly represent government policy or the force of law; and (3) the acts or policies of officials who by law or delegation possess final policymaking authority for the local government concerning the action alleged to have caused the particular constitutional or statutory violation at issue. *See Pembaur*, 475 U.S. at 480-81; *Monell*, 436 U.S. at 691; *Adickes v. S.H. Kress & Co.*, 398 U.S.144, 167-68 (1970); *Culbertson*, 790 F.3d at 628; *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc). Moreover, a municipality may be held liable for a single act or decision of a final

12

policymaker, as when a municipality's properly constituted legislative body approves and executes a single unconstitutional decision. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Pembaur*, 475 U.S. at 480. But even when accountability is sought based on a single act, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

Appellees sought to establish Harris County's liability through at least one of five independent questions. The jury answered all five questions in appellees' favor. Although the county attacks each question on multiple grounds, the county's challenge to the policymaker element is common to all theories and dispositive of Harris County's appeal, so we address only that issue. *See* Tex. R. App. P. 47.1.

Each liability question required appellees to identify a final policymaker for Harris County concerning the violation at issue, which the county says was not done.[6] Regarding policymakers in the section 1983 context, our task is to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *McMillian*, 520 U.S. at 784-85; *see Pembaur*, 475 U.S. at 482-83. Our inquiry is informed by well-known principles. First, we must ask whether a particular official or body is a final policymaker for the local government "in a particular area" or "on a particular issue."

---

[6] Harris County preserved its argument in the trial court by objecting to the relevant charge instruction and asserting in post-trial motions that elected constables are not final policymakers for the county.

13

*McMillian*, 520 U.S. at 785. An official may be a final policymaker with respect to some areas but not others. *See Pembaur*, 475 U.S. at 483 n.12; *Harris County v. Nagel*, 349 S.W.3d 769, 786 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

Second, whether a local government official is a final policymaker in a particular area is a question of state law. *McMillian*, 520 U.S. at 786; *Jett*, 491 U.S. at 737; *Praprotnik*, 485 U.S. at 123; *Nagel*, 349 S.W.3d at 786. State law always should direct us "to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business," *Praprotnik*, 485 U.S. at 125, and the trial court must identify that official or body for the jury. *Jett*, 491 U.S. at 737. We may not assume that final policymaking authority lies in some entity or person other than where state law places it. *See Praprotnik*, 485 U.S. at 126. Additionally, authority to make local government policy may be granted directly by a legislative enactment or may be delegated by an official or body possessing such authority. *See id.* at 124; *Pembaur*, 475 U.S. at 483; *Nagel*, 349 S.W.3d at 794 (concluding commissioners court delegated responsibility and allocated funds for executing mental health warrants county-wide to single constable precinct); *see also City of Houston v. Aspenwood Apartment Corp.*, No. 01-97-01378-CV, 1999 WL 681939, *7 (Tex. App.—Houston [1st Dist.] Aug. 27, 1999, pet. denied) (not designated for publication).

Third, policymaking authority encompasses more than discretionary authority. One who speaks with final policymaking authority for the local government is effectively one who "takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). Such a person decides the goals for a particular city or county function, devises the means of achieving those goals, acts in the place of the governing body in the area of delegated responsibility, and is not supervised except

14

as to the totality of performance. *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984). In contrast, that a particular official—even a policymaking official—has discretion to exercise particular functions does not automatically give rise to local government liability based on the exercise of that discretion. *See Pembaur*, 475 U.S. at 481-83; *Bennett*, 728 F.2d at 769; *City of Houston v. Leach*, 819 S.W.2d 185, 199 (Tex. App.—Houston [14th Dist.] 1991, no writ).

To the extent the policymaker question turns solely on questions of law, we apply de novo review. *E.g.*, *Godoy v. Wells Fargo Bank, N.A.*, 575 S.W.3d 531, 536 (Tex. 2019). We agree with appellees, however, that when it is alleged that a final policymaker received authority by delegation from the relevant lawmakers, whether and to what extent delegation in fact occurred may involve evidence. *See Nagel*, 349 S.W.3d at 794. We apply traditional evidentiary sufficiency review standards to such determinations when they are present and challenged. *See id*. (applying legal sufficiency review to commissioners court delegation of authority to constable).

2.    *Application*

Over Harris County's objection, the trial court instructed the jury that "Harris County Precinct Four Constable Ron Hickman had final policymaking authority from Defendant Harris County concerning the act(s) at issue." Harris County contests the assertion because it contravenes state law and because constables act for the state, not the county, in law enforcement matters.[7]

At the outset, we consider the particular area of local government at issue. *McMillian*, 520 U.S. at 785. The policies appellees contend were at the heart of the

---

[7] The county also complains of a separate instruction, which allowed the jury to find that any constable other than Constable Hickman could also be a Harris County policymaker. We need not address the point, however, because on appeal appellees contend that only Constable Hickman was the final policymaker for Harris County in the relevant area.

violations, and for which they say the Precinct Four Constable is solely responsible, are law enforcement policies. Appellees' claim is based on use of force policies contained in the Precinct Four Constable Policy and Ethics Manual. For example, in the jury charge appellees specifically identified key policies from the manual, such as the sections concerning "Necessary Force in Making Arrests," "Use of Force," and "Policy for Deadly Force." These policies form the focal point of appellees' argument that Deputy Vailes applied constitutionally excessive force in placing his foot on Jamail's face. Additionally, the function Deputy Vailes was performing at the time of the violation was a law enforcement activity. Providing safety back-up, he arrived on the scene to find a person in handcuffs engaged in a struggle with another officer. We thus conclude that the local government area in question is fairly characterized as law enforcement.

Next we examine whether, in a county consisting of more than one constable precinct, state law establishes that a single constable is a final policymaker for that county in the area of law enforcement. *See McMillian*, 520 U.S. at 786 (state law controls policymaker inquiry); *Jett*, 491 U.S. at 737; *Nagel*, 349 S.W.3d at 786. To be a final policymaker for a county, a constable must occupy a relationship to the county such that his or her "edicts or acts may fairly be said to represent official county policy." *Rhode v. Denson*, 776 F.2d 107, 108 (5th Cir. 1985), *cert. denied*, 476 U.S. 1170 (1986). A policymaker not only governs conduct but decides goals for a particular local government function and devises means of achieving those goals. *See id.* at 110 (citing *Bennett*, 728 F.2d at 769).

The principal organ of county government in Texas is the commissioners court. *Comm'rs Court of Titus Cty. v. Agan*, 940 S.W.2d 77, 79 (Tex. 1997) (citing Tex. Const. art. V, § 1). The Texas Constitution requires the commissioners court of each county over a certain population to divide the county into no less than four

but not more than eight geographic precincts. Tex. Const. art. 5, § 18. The voters of each precinct elect one constable for that precinct. *Id*.; *Merritt v. Harris County*, 775 S.W.2d 17, 24 (Tex. App.—Houston [14th Dist.] 1989, writ denied). Harris County has eight constable precincts and thus eight constables. *See* Harris County Constable Precincts, http://www.harriscountytx.gov/Government/Law-Enforcement/Harris-County-Constable-Precincts (last visited January 9, 2020); *see also Maxon v. Franz*, 525 S.W.2d 714, 714 (Tex. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). A constable's general powers and duties include attending justice court in the precinct and executing and returning processes, warrants, and precepts. Tex. Loc. Gov't Code § 86.021. A constable is also authorized to perform other acts as established by law, such as those permitted or required to be performed by "peace officers." Tex. Code Crim. Proc. art. 2.12(2) (constables are peace officers). As peace officers, constables have the duty "to preserve the peace within the officer's jurisdiction," with authority to "use all lawful means" to effect that purpose. *Id*. art. 2.13(a). A peace officer's primary law enforcement duties include: (1) interfering without warrant to prevent or suppress crime; (2) executing all lawful processes; (3) notifying magistrates of offenses committed within the officer's jurisdiction; and (4) arresting offenders when authorized by law. *See id*. art. 2.13(b). Generally a peace officer's law enforcement authority is limited to the officer's geographic jurisdiction, but constables may perform any express statutory duties anywhere within the county in which the constable's precinct is located (including within other precincts) and may additionally serve civil processes in contiguous counties. *See* Tex. Loc. Gov't Code § 86.021(c), (d); *see also* Tex. Att'y Gen. Op. No. GA-0189, at *3 (2004). Commissioners courts must compensate constables, but they cannot remove them. Tex. Const. art. 16, § 61. Only district courts may remove constables from office and then only for limited, specific reasons. Tex. Const. art. 5, § 24; Tex. Loc. Gov't Code § 87.013. In the event of removal, however, the commissioners

17

court may fill a constable vacancy. Tex. Loc. Gov't Code § 87.041(a)(10). If an elected constable wants to appoint a deputy, he must apply to the county's commissioners court and show the deputy is needed to properly handle the business of the constable's office that originates in the precinct. *Id*. § 86.011(a). The commissioners court must approve and confirm the appointment only if it determines that the constable needs a deputy. *Id*. The constable is then responsible for the official acts of each deputy. *Id*. § 86.011(c).

Appellees emphasize that a constable's law enforcement jurisdiction extends to the entire county. Tex. Loc. Gov't Code § 81.021(c); *see also* Tex. Att'y Gen. Op. No. GA-0189 at *4 (2004). We are not convinced, however, that a constable's jurisdictional reach can support the trial court's conclusion that the Precinct Four Constable is a law enforcement final policymaker for Harris County. A constable's state-given authority and discretion to perform law enforcement tasks within a county-wide geographic area does not equate to authority to define law enforcement goals and means of achieving those goals for that county. To the extent law enforcement jurisdictional reach is relevant, it certainly is not a weighty factor in the policymaker inquiry because constables may perform law enforcement tasks outside of their respective counties. *See* Tex. Loc. Gov't Code § 86.021(c), (d). Here, the Precinct Four Constable Office's civil process service jurisdiction extends not only to the boundaries of Harris County but to its seven contiguous counties—Fort Bend, Brazoria, Galveston, Chambers, Liberty, Montgomery, and Waller. No one could reasonably argue that Constable Hickman is a final policymaker for law enforcement in Galveston County merely because he is authorized to perform certain law enforcement functions there.

More persuasive is appellees' reliance on state law describing the control certain county officials possess over matters within their sphere of authority. Each

county elected official "has the sphere that is delegated to him by law and within which the Commissioners Court may not interfere or usurp." *Pritchard & Abbott v. McKenna*, 350 S.W.2d 333, 335 (Tex. 1961). An elected county official's exclusive sphere of authority consists of the officer's core duties under the Texas Constitution and statutes. *See Griffin v. Birkman*, 266 S.W.3d 189, 197 (Tex. App.—Austin 2008, pet. denied). Appellees cite Texas Attorney General Opinion GA-0994, in which the Attorney General opined that a county commissioners court probably lacks authority to approve or disapprove the county sheriff's office policy manual. In support of the opinion, the Attorney General stated that county officers such as a Texas sheriff hold "virtually absolute sway over the particular tasks or areas of responsibility entrusted to [them] by state statute." Tex. Atty Gen. Op. No. GA-0994, at *1 (citing *Hooten v. Enriquez*, 863 S.W.2d 522, 531 (Tex. App.—El Paso 1993, no writ) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980))).

Appellees contend the same is true for constables, as they too are county officers.[8] Some evidence supports appellees' position that constables have ultimate responsibility within their precincts for matters entrusted to them by law. The policy manual states that Constable Hickman is the chief executive for the Precinct Four Constable department. Constable Hickman testified that he is the "number one guy" in the Precinct Four Constable's Office as to constable policies, which are not subject to review by "higher authority" and are not reviewed by the sheriff. Other county

---

[8] Tex. Const. art. 5, § 24; art. 16, § 61; *see also* Tex. Loc. Gov't Code § 87.012(12) (identifying constables as county officers); *id*. § 152.001 (county officers may be paid from county general fund or from other funds available for that purpose).

representatives confirmed that Constable Hickman had ultimate responsibility for Precinct Four Constable policies.

Though the trial court could have credited Constable Hickman's testimony, it is nonetheless insufficient to support the court's instruction. Constable Hickman has the final word in Precinct Four as to office policies, and by extension one could also infer that each of the eight constables in Harris County is responsible for policies in his or her separate precinct. Appellees' burden, however, was to identify a final policymaker who speaks on law enforcement matters for the local government unit at issue—Harris County. Appellees direct us to no authority or evidence showing that Constable Hickman had policymaking authority over any precinct other than Precinct Four or over the county as a whole. No Texas state court has ever held that a constable in a single precinct is the *county's* final policymaker for law enforcement. State and federal courts construing Texas law have long held that the sheriff is a county's final policymaker as to law enforcement for purposes of county liability under section 1983.[9] To be sure, policymaking authority in areas of county business may be shared among more than one official,[10] but accepting appellees' view would result in nine law enforcement final policymakers for all of Harris County: the county sheriff and all eight constables. In any event, Hickman's testimony is not controlling on the issue whether, as a matter of state law, he was the final policymaker for Harris County on law enforcement. *Frank v. Harris County*,

---

[9] *See County of El Paso v. Dorodo*, 180 S.W.3d 854, 869 (Tex. App.—El Paso 2005, pet. denied); *Robinson v. Hunt County*, 921 F.3d 440, 448 (5th Cir. 2019); *Jackson v. Ford*, 544 F. App'x 268 (5th Cir. 2013) ("[I]n Texas, '[t]he sheriff is without question the county's final policymaker in the area of law enforcement.'" (quoting *Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993))); *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009); *Turner v. Upton County*, 915 F.2d 133, 136-37 (5th Cir. 1990) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)).

[10] *Praprotnik*, 485 U.S. at 126.

118 F. App'x 799, 802 (5th Cir. 2004). His testimony cannot make it so when the people of Texas have not granted him that authority through the constitution or statute.

A constable's position as a county officer or elected official is insufficient as well. An elected constable may be a county agent, but that status does not bring the person within the necessarily circumscribed group of people whose "edicts or acts may fairly be said to represent official county policy." *Rhode*, 776 F.2d at 108. As Precinct Four Constable, Constable Hickman was not one who "takes the place of the governing body in a designated area of [county] administration." *Webster*, 735 F.2d at 841; *see Bowden v. Jefferson County*, 676 F. App'x 251, 256 (5th Cir. 2017) ("As the constable of one out of eight precincts in Jefferson County, Saleme may have been a decision maker for a single precinct, but he was not a policymaker for all of Jefferson County."). We therefore conclude that the state constitution and relevant state and local laws do not vest a precinct constable in Harris County with final policymaking authority over law enforcement for the county.

Though federal courts' interpretation of state law is not binding on us,[11] we note that the Fifth Circuit has independently reached the same conclusion. Since 1985, that court has held repeatedly that a precinct constable is not a final policymaker for a Texas county in the area of law enforcement. *See Castro v. McCord*, 259 F. App'x 664, 668 (5th Cir. 2007); *Keenan v. Tejeda*, 290 F.3d 252, 263 (5th Cir. 2002); *Bowles v. Cheek*, 44 F. App'x 651 (5th Cir. 2002); *Pena v. Jimenez*, 31 F. App'x 833 (5th Cir. 2002); *Sorrells v. Warner*, 21 F.3d 1109 (5th Cir. 1994); *Rhode*, 776 F.2d at 108-09 (reversing judgment against the county for constable's unconstitutional acts during attempted arrest). Federal district courts

---

[11] *See Stanley v. Reef Sec., Inc.*, 314 S.W.3d 659, 677 n.4 (Tex. App.—Dallas 2010, no pet.).

21

within the circuit are in accord, including, as relevant, in excessive force suits. *See, e.g.*, *Gremar v. Bexar County, Tex.*, No. SA-13-CV-434-XR, 2014 WL 906796, at *2 n.1 (W.D. Tex. Mar. 7, 2014); *Birge v. Harris County*, No. 4:09-CV-660, 2009 WL 10693565, at *2 (S.D. Tex. May 21, 2009) (constable not county policymaker in excessive force suit); *Ramos v. Lucio*, No. B-08-122, 2008 WL 11503546, at *3 (S.D. Tex. Sept. 25, 2008) (in excessive force case resulting from death of hog-tied suspect, court held precinct constable not county's final policymaker for law enforcement); *Drain v. Galveston County*, 979 F. Supp. 1101, 1103 (S.D. Tex. 1997) (shooting during arrest).

Our conclusion does not end the inquiry, however, because those in whom state law vests policymaking power may delegate it to particular local government officials, a question we addressed in *Nagel*. There we considered Harris County's section 1983 liability for a constable's (or deputy's) unconstitutional conduct. *Nagel*, 349 S.W.3d at 792-94. We held that the Harris County Precinct One Constable was Harris County's final policymaker concerning the manner in which mental health warrants were executed. *Id.* at 791. The evidence in *Nagel* showed that the commissioners court had delegated to a single constable precinct policymaking authority—and concomitant county funds to exercise the authority delegated—to serve all mental health warrants county-wide since the early 1970s. *Id.* at 793-94. The evidence in *Nagel* showed that the Harris County commissioners court, through its budgeting process, allocated funds and responsibility for serving mental health warrants to a single precinct and, accordingly, "the County effectively designated the constable of that precinct as the final policymaker concerning the manner in which those warrants were served." *Id.* at 794.

Appellees say *Nagel* controls and the Precinct Four Constable is the county policymaker for law enforcement because the county impliedly delegated that

authority to him. Appellees point us to testimony discussed above that Constable Hickman had the last word on department policies. But this is not evidence that the Constable of Precinct Four "takes the place of the governing body" with respect to law enforcement in Harris County. *Webster*, 735 F.2d at 841. In contrast to *Nagel*, the present evidence shows no delegation of responsibility to constables for county-wide law enforcement policymaking generally or assisting EMS personnel specifically. The record contains no evidence that the commissioners court allocated funds to the Precinct Four Constable commensurate with policymaking authority for county-wide law enforcement; nor evidence that Harris County impliedly acknowledged that Constable Hickman acted in lieu of the county's governing body with respect to law enforcement. *See Bennett*, 728 F.2d at 769. The constable in *Nagel* performed a narrow function for the entire county to the exclusion of all other constable precincts and had done so for years, with budgetary support allocated to a single precinct for the specific purpose at issue. *See Nagel*, 349 S.W.3d at 794.

The evidence before us does not support appellees' argument that a final policymaking person or body of Harris County delegated to Constable Hickman final policymaking authority over law enforcement for the county. When applicable law shows that the person alleged to be a policymaker for a particular area of municipal business does not in fact meet the test, and no evidence otherwise demonstrates a delegation of sufficient authority, then the municipality can have no section 1983 liability arising out of that official's challenged conduct. *See Roberson v. City of Austin*, 157 S.W.3d 130, 141 (Tex. App.—Austin 2005, pet. denied); *Democracy Coalition v. City of Austin*, 141 S.W.3d 282, 293-95 (Tex. App.—Austin 2004, no pet.); *City of Houston*, 1999 WL 681939, at *11.

We hold as a matter of law that an elected constable of Harris County is not, absent specific facts not present in this case, the final policymaker for the county on

23

law enforcement matters such that a deputy constable's unconstitutional conduct is chargeable to the county. Additionally, there exists no evidence in this case of implied delegation to the Precinct Four Constable of county-wide policymaking authority on law enforcement. The trial court's contrary instruction was error, and we sustain Harris County's first issue. Therefore, the judgment against Harris County cannot stand. Given our holding, we need not address Harris County's alternative separation of powers argument that a constable can never be a county policymaker when discharging law enforcement duties imposed by state law.

## B.    Deputy Vailes

Deputy Vailes challenges the judgment against him on several grounds. His first issue contains two sub-parts: (1) no legally or factually sufficient evidence supports the jury's findings that he used excessive force or unreasonably seized Jamail; and, (2) he is entitled to qualified immunity. In issue two, Deputy Vailes challenges the legal and factual sufficiency of the evidence to support the jury's finding that his actions proximately caused Jamail's death. In his third issue, he complains of jury charge error. Finally, he contends that the jury's punitive damage award has no legally or factually sufficient evidentiary support. We address each issue in turn.

> 1.    *Legally and factually sufficient evidence supports the jury's finding that Deputy Vailes used excessive force.*

The trial court's instruction and question regarding the excessive force claim provided:

> First, Plaintiffs claim that Defendant Kevin Vailes violated the Fourth Amendment to the Constitution by using excessive force against their son, Jamail Amron, on September 30, 2010. The Fourth Amendment prohibits a law enforcement officer from using unreasonable or excessive force against an individual. To prevail on a

24

Fourth Amendment excessive-force claim, Plaintiffs must prove by a preponderance of the evidence:

1. that Jamail Amron sustained an injury resulting directly from the use of excessive force; and

2. that the excessiveness of the force was objectively unreasonable.

The reasonableness of a particular use of force is based on what a reasonable officer would do under the circumstances and not on the defendant's state of mind. You must decide whether a reasonable officer on the scene would view the force as reasonable, without the benefit of 20/20 hindsight. This inquiry must consider the fact that police officers are sometimes forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

. . .

## QUESTION 1

Do you find that Jamail Amron sustained an injury resulting directly from the use of excessive force by Defendant Kevin Vailes and that the excessiveness of the force was objectively unreasonable?

The jury answered, "Yes." In the first part of Deputy Vailes's first issue, he challenges the legal and factual sufficiency of the evidence supporting the jury's answer to question one.

### a.     Standard of Review

When a party attacks the legal sufficiency of an adverse finding on which he did not have the burden of proof, he must demonstrate on appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). We review the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *City of Keller v. Wilson*, 168 S.W.3d 802, 821-22, 827 (Tex. 2005); *see also Graham Cent. Station*, 442 S.W.3d at 263. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the fact finder must be allowed

25

to do so, and we may not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which the party did not have the burden of proof, we may set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Bennett v. Comm'n for Lawyer Discipline*, 489 S.W.3d 58, 66 (Tex. App.—Houston [14th Dist.] 2016, no pet.). We consider all the evidence, but we will not reverse the judgment unless "the evidence which supports the [ ] finding is so weak as to [make the finding] clearly wrong and manifestly unjust." *Star Enter. v. Marze*, 61 S.W.3d 449, 462 (Tex. App.—San Antonio 2001, pet. denied); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The amount of evidence necessary to affirm is far less than the amount necessary to reverse a judgment. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). "If we determine that the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the challenged finding; we need not do so when we affirm." *Bennett*, 489 S.W.3d at 66.

We apply these standards mindful that this court is not a fact finder. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The trier of fact is the sole judge of witness credibility and the weight afforded their testimony. *GTE Mobilnet*, 61 S.W.3d at 615-16; *see City of Keller*, 168 S.W.3d at 819-20. Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *GTE Mobilnet*, 61 S.W.3d at 615-16.

### b. Excessive Force Claims

To establish a section 1983 excessive-force claim, a plaintiff must show that he was seized and that he "suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). Excessive force claims are fact-intensive, and courts must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citing *Graham*, 490 U.S. at 396). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

### c. Application

First, Deputy Vailes argues that because the jury found Jamail was partially responsible for his own death, Jamail did not sustain an injury that resulted directly and only from the use of force that was excessive to the need. Here, the language of question one omitted the words "and only." Deputy Vailes did not preserve this point, however, because only Harris County objected to question one on the ground that it omitted the words "and only." "[O]ne party may not use another party's objection to preserve an error where the record does not reflect a timely expression of an intent to adopt the objection." *Daniels v. Yancey*, 175 S.W.3d 889, 892 (Tex. App.—Texarkana 2005, no pet.) (citing *Scott Fetzer Co. v. Read*, 945 S.W.2d 854, 871 (Tex. App.—Austin 1997), *aff'd*, 990 S.W.2d 732 (Tex. 1998)). The record does not reflect that Deputy Vailes timely objected on the ground he asserts in our court or that he adopted Harris County's objection. Thus, we measure the

27

sufficiency of the evidence by the charge as given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).[12]  In conducting our review, we consider only the evidence pertaining to Deputy Vailes's actions, viewed in the light most favorable to the jury's findings.[13]

When officers were dispatched to the scene, they were responding as back-up to a medical emergency call.  Lansdale testified that Jamail did not appear to be a threat to himself or anyone else when Deputy Saintes arrived.  After Jamail ran from the ambulance toward the restaurant, he struggled with Deputies Saintes and Reese as they attempted to secure him against the patrol car.  Deputy Vailes arrived during the struggle and assisted in immobilizing Jamail while an EMT injected Jamail's shoulder.  According to Lansdale, Jamail immediately collapsed into the officer's arms.

Lansdale testified that Deputy Vailes placed the sole of his boot on Jamail's face as Jamail lay handcuffed and unresponsive on the ground.  Lansdale explained that Deputy Vailes applied enough force to compress Jamail's neck to the ground even though Jamail was not actively resisting and appeared to her to be unconscious.[14]

---

[12] In any event, as we explain below, there exists some support in the record that Jamail sustained pain and mental anguish damages resulting "directly and only" from Deputy Vailes's use of excessive force.  The jury did not find that Jamail contributed to his survival damages.

[13] *See, e.g.*, *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (explaining that reasonableness of each officers' actions should be evaluated separately).

[14] Lansdale's initial signed statement to the sheriff varied from her trial testimony as to whether Jamail resisted.  In her statement, Lansdale said, "[Jamail] then began to twitch and was moving around.  The officers then used their feet to control the male from moving around on the concrete.  I believe that the officers were just trying to help the male so that he would not hurt himself."  We presume the jury resolved factual discrepancies in Lansdale's testimony favorably to appellees.

28

Witnesses generally agreed that an officer's conduct described by Lansdale would constitute excessive force under these circumstances. Deputy Saintes testified that an officer putting his foot on Jamail's face would be improper and involve excessive force. Deputy Reese agreed that the only reason for Deputy Vailes to use his feet to restrain Jamail's head would have been to prevent Jamail from banging his head on the concrete. He acknowledged that "if you take away the head banging, you would have to take away the reason for using the feet as a form of use of force." Corporal Haver testified that nothing that Jamail was doing that evening would have justified "having a foot on his face." Appellees' expert, Keith Howse, testified that it would be objectively unreasonable to step on a person's face when that person was on the ground unconscious. Even Deputy Vailes acknowledged that placing his boot on Jamail's face and pressing down would be "against the law" and "excessive for somebody that was under arrest, much less somebody that wasn't."

Deputy Vailes's appellate argument is grounded on the factual proposition that he never placed his booted foot over Jamail's mouth and nose. Deputy Vailes testified that he used his feet to "cradle" Jamail's head because Jamail was thrashing his head and banging it on the ground. None of the other officers saw Deputy Vailes place his boot on Jamail's face or head; Deputies Saintes and Reese testified that they saw Deputy Vailes using his hands to keep Jamail from "violently" banging his head against the ground.

The jury rejected that version of events. Viewing the evidence in the light most favorable to the jury's answer to question one and indulging every reasonable inference that supports it, we conclude the jury could have reasonably accepted Lansdale's testimony. At the time Lansdale saw Deputy Vailes place his foot on Jamail's face, a reasonable jury could have found that Jamail did not pose an immediate threat to the safety of the officers or others, and he was not actively

resisting arrest or attempting to evade arrest by flight. *See Graham*, 490 U.S. at 396 (identifying these factors as important in determining whether a seizure or use of force is reasonable); *see also Ramirez*, 716 F.3d at 378; *Marcantel*, 567 F.3d at 162 (police officer's breaking plaintiff's window when she refused to exit her vehicle after being pulled over for speeding, dragging her out of the car, and throwing her against the car window constituted use of excessive force); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (arresting officer who slammed arrestee's face into rear window of her car after she was handcuffed and subdued used excessive and objectively unreasonable force). Further, crediting Lansdale's depiction of events, no reasonable officer could have determined that Jamail posed a threat while he was lying motionless on the ground in handcuffs such that placing one's boot over his nose and mouth would be reasonable. *See Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) ("[A] reasonable officer could not have concluded Ramirez posed an immediate threat to the safety of the officers by questioning their presence at his place of business or laying on the ground in handcuffs."); *cf. also Nagel*, 349 S.W.3d at 785 (collecting cases holding that "officers use excessive force if they apply significant pressure to a person who is hogtied"). Thus, legally sufficient evidence supports the jury's finding that Deputy Vailes used objectively unreasonable and excessive force.

Further, considering the evidence both in favor of and contrary to the jury's answer to question one, we cannot say the finding is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust.

We overrule this portion of Deputy Vailes's first issue.[15] It is therefore unnecessary to address Deputy Vailes's evidentiary sufficiency challenges to the

---

[15] Because factually sufficient evidence supports the jury's answer to question one, we also overrule Deputy Vailes's alternative request for a new trial.

jury's finding in question two that Deputy Vailes intentionally and unreasonably seized Jamail. *See* Tex. R. App. P. 47.1; *see also Hieber v. Percheron Holdings, LLC*, —S.W.3d—, No. 14-19-00505-CV, 2019 WL 6001153, at \*5 (Tex. App.—Houston [14th Dist.] Nov. 14, 2019, pet. filed).

2. *Deputy Vailes is not entitled to qualified immunity.*

Deputy Vailes next argues he is entitled to qualified immunity as a matter of law, and that the trial court erred in denying his post-judgment motion in that regard. Qualified immunity shields government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Nagel*, 349 S.W.3d at 777-78. The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Qualified immunity is an affirmative defense. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Pasco v. Knoblauch*, 566 F.3d 572, 575 (5th Cir. 2009). Once a defendant raises qualified immunity, the burden shifts to the plaintiff to show that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the violation. *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *see Pearson*, 555 U.S. at 232. The jury found that Deputy Vailes violated Jamail's constitutional rights. The court, in denying Deputy Vailes's post-judgment motion, necessarily determined that the right violated was clearly established in September

31

2010. *See, e.g.*, *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (explaining that existence of "clearly established" law is a question for the court).

As explained above, sufficient evidence supports the jury's finding that Deputy Vailes violated Jamail's Fourth Amendment right to be free from excessive force, the excessiveness of which was objectively unreasonable. The witnesses consistently agreed that, if Deputy Vailes acted in the manner described by Lansdale, then his actions would be unlawful. Their testimony comports with relevant case law. *Cf. Samples v. Vadzemnieks*, 900 F.3d 544, 661-62 (5th Cir. 2018) (explaining that first prong of qualified immunity inquiry satisfied when officer used a taser when there was no reason to believe that Samples "committed a crime, sought to flee, or posed a threat of danger to the [officers]"); *Ramirez*, 716 F.3d at 378; *Bolick v. City of E. Grand Rapids*, 580 F. App'x. 314, 319-20 (6th Cir. 2014) (denying officers' motion for summary judgment because jury could find that officers' use of taser and applying weight to suspect's body when he was handcuffed and no longer resisting arrest constituted objectively unreasonable excessive force); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (holding that use of force was not objectively reasonable where officers lay on top suspect who had stopped resisting arrest and posed no flight risk and sprayed him with pepper spray). Thus, we resolve the first prong of the qualified immunity inquiry against Deputy Vailes.

We turn to whether Jamail's right to be free of the degree of force applied under these circumstances was clearly established as of September 2010. *See Turner v. Perry*, 278 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015)). To be clearly established, a legal principle or right must have a sufficiently clear foundation in then-existing precedent. *See District of Columbia v. Wesby*, — U.S. —, 138 S.Ct. 577, 589-90 (2018). The right must be

"settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority'" that place the constitutional question beyond debate. *See Wesby*, 138 S. Ct. at 589-90; *al-Kidd*, 563 U.S. at 741-42. Precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *Wesby*, 138 S. Ct. at 590. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*

Further, as the Supreme Court has instructed, we are "not to define clearly established law at a high level of generality." *Mullenix*, 136 S.Ct. at 308; *al-Kidd*, 563 U.S. at 742. The interests immunity preserves are so great that the Supreme Court insists the right and its particular contours be articulated in light of the "specific context of the case," not as a broad general proposition. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

We conclude that "controlling authority" or "a robust 'consensus of cases of persuasive authority'"[16] as of September 2010 make it sufficiently clear that every reasonable official would understand (as did those who testified) that stepping on the nose and mouth of someone who is lying on the ground, likely sedated, handcuffed, and described by an eyewitness as generally unresponsive, with enough force that the person's neck touches the ground, would constitute an excessive-force Fourth Amendment violation under the present circumstances. In September 2010, it was clearly established that comparable uses of gratuitous force against a subdued and restrained detainee was unreasonable. *See, e.g.*, *Bush*, 513 F.3d at 501-02 (officer's slamming suspect's face into vehicle when suspect was handcuffed and

---

[16] *Wesby*, 138 S. Ct. at 589-90.

subdued was excessive); *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) (fact question on qualified immunity when officer intentionally slammed car door on head of suspect, who did not pose immediate threat to anyone's safety, and posed no risk of escape); *Gomez v. Chandler*, 163 F.3d 921, 922, 924-25 (5th Cir. 1999) (slamming prisoner's face into concrete floor "while [prisoner's] hands were handcuffed behind his back" could be excessive); *see also Shannon v. Koehler*, 616 F.3d 855, 863 (8th Cir. 2010) ("Assuming, then, that Shannon's story is true—i.e., assuming he was not threatening anyone, not resisting arrest, and so on—it was not reasonable for Officer Kohler to use more than de minimis force against him."); *Bailey v. Kennedy*, 349 F.3d 731, 745 (4th Cir. 2003) (unarmed person, handcuffed, lying face down on floor; officer lifted person by his bound arms and kicked him in back; use of force was excessive after person was "secured face down on the floor in handcuffs and leg restraints"); *Kane v. Hargis*, 987 F.2d 1005, 1006-07 (4th Cir. 1993) (denying qualified immunity on excessive force claim where, after officer secured suspect, he "repeatedly push[ed] her face into the pavement, cracking three of her teeth, cutting her nose, and bruising her face"); *Lewis v. City of Albany Police Dep't*, 547 F. Supp. 2d 191, 206-10 (N.D.N.Y. 2008), *aff'd*, 332 F. App'x 641 (2d Cir. 2009), *cert. denied*, 558 U.S. 1050 (2009) (while plaintiff handcuffed on pavement, officer stepped on head with full weight and ground his face into pavement, causing abrasions, contusion, and closed head injury; court upheld jury verdict finding excessive force). Appellees' expert agreed that an officer aware of the law on September 30, 2010, should know that stepping on a restrained person's face with the amount of force described by Lansdale, when the person is on the ground and not resisting, violates the law.

As Deputy Vailes characterizes the issue, the law was not clearly established "that any use of feet by an officer during a seizure of a person is a violation of a

Fourth Amendment right to be free from excessive force in 2010." Deputy Vailes's description of clearly established law, however, is both impermissibly general and contrary to facts the jury accepted. We hold Deputy Vailes is not entitled to qualified immunity and overrule this issue.

3. *The jury's finding that Deputy Vailes's constitutional violations caused Jamail's death is not supported by legally sufficient evidence.*

In his second issue, Deputy Vailes challenges the legal and factual sufficiency of the evidence to support the jury's finding in question nine that he proximately caused Jamail's death. Question nine asked:

> Do you find that any individual or entity named below proximately caused the death of Jamail Amron?
>
> a. Defendant Harris County     Yes
> b. Defendant Kevin Vailes     Yes
> c. Jamail Amron     Yes
>
> "Proximate cause" means a cause that was a substantial factor in bringing about an occurrence, and without which cause such occurrence would not have happened. There may be more than one proximate cause of an occurrence.

We address legal sufficiency first and apply traditional legal sufficiency review principles outlined above. *City of Keller*, 168 S.W.3d at 821-22, 827.

a. Applicable Law

The facts of this case involve an unfortunate and unnecessary death. Even so, the plaintiff bears the burden to prove that the challenged conduct caused the death at issue. *See Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 874 (Tex. App.—Beaumont 2007, pet. denied); *Sisters of St. Joseph of Texas, Inc. v. Cheek*, 61 S.W.3d 32, 37 (Tex. App.—Amarillo 2001, pet. denied). Causation must be shown to a reasonable medical probability. *See Jelinek v. Casas*, 328 S.W.3d 526,

532-33 (Tex. 2010). Breach of a duty proximately causes an injury if the breach is a cause in fact of the harm and the injury was foreseeable. *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016); *see Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008). Here, the jury charge's proximate cause definition included only the cause in fact element, and Deputy Vailes does not complain of the foreseeability element's omission. *See, e.g.*, *IHS Cedars Treatment Ctr. of DeSoto, Tex. Inc. v. Mason*, 143 S.W.3d 794, 799 (Tex. 2004). Because absent objection we measure the sufficiency of the evidence by the charge given,[17] we consider only whether the record contains legally sufficient evidence of cause in fact.

Cause in fact is established when the act or omission was a substantial factor in bringing about the injury, without which the harm would not have occurred. *Stanfield*, 494 S.W.3d at 97; *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). A claimant must prove these elements by more than conjecture, guess, or speculation. *Stanfield*, 494 S.W.3d at 97; *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 798-99.

b. Application

Appellees' theory is that Jamail died because Deputy Vailes placed his boot over Jamail's nose and mouth for two to five minutes and suffocated him. Deputy Vailes argues that Jamail died because of acute cocaine toxicity, as the medical examiner concluded following Jamail's autopsy. According to Deputy Vailes, appellees offered no competent expert evidence establishing, within a reasonable medical probability, that asphyxia was the cause of death and that acute cocaine

---

[17] *See Osterberg*, 12 S.W.3d at 55.

toxicity was not the cause of death. In response, appellees insist expert testimony was not required, and that they presented sufficient lay testimony to support the causation finding. We agree with Deputy Vailes.

In cases alleging medical injury or death, expert testimony regarding causation is generally the norm. *See Jelinek*, 328 S.W.3d at 533. The only time this is not so is when "general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Id.*; *see JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 162 (Tex. 2015); *Guevara v. Ferrar*, 247 S.W.3d 662, 665 (Tex. 2007); *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2003); *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). To be sufficient, lay evidence must establish a "sequence of events which provides a strong, logically traceable connection between the event and the condition"[18] that is "apparent to the casual observer." *Jelinek*, 328 S.W.3d at 533. Additionally, "if evidence presents 'other plausible causes of the injury or condition that could be negated, the [proponent of the testimony] must offer evidence excluding those causes with reasonable certainty.'" *JLG Trucking*, 466 S.W.3d at 162 (quoting *Transcont. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010)). When expert testimony is required, however, lay evidence supporting liability is legally insufficient. *City of Keller*, 168 S.W.3d at 812. Lay testimony as evidence of causation sufficed, for example, in cases like *Guevara*[19] and *Morgan*,[20] but not in

---

[18] *Guevara*, 247 S.W.3d at 666.

[19] 247 S.W.3d at 668 (bone fractures, pain following automobile accident).

[20] *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (previously healthy employee suffered watery eyes, blurred vision, headaches, and swelling of breathing passages upon exposure to leaking chemicals).

*Jelinek*[21] or *Roark*.[22] Courts have also held that expert evidence is required when cause of death is at issue, such as in *Myers*[23] and *Rodriguez*.[24]

Appellees assert that no expert evidence is necessary for a jury to understand that "depriving a person of air for five minutes will cause death." As an example, they posit that, had the evidence shown that Deputy Vailes placed a plastic bag over Jamail's head, a jury would have been justified in finding that Deputy Vailes caused Jamail's death by suffocation. Assuming that is true, the question is not whether suffocation causes death, but whether Deputy Vailes in fact caused Jamail's death by suffocating him with his boot. Appellees rely principally on Lansdale, who said she saw Deputy Vailes's boot on Jamail's face two times, separated by two to five minutes. According to appellees, the jury could have inferred that Deputy Vailes's boot completely obstructed Jamail's airways for two to five minutes, and that as a result Jamail was not breathing and had died once Deputy Vailes removed his foot and walked to his patrol car.

On the present record, we disagree that the jury could have reasonably drawn the inference appellees suggest. Lansdale saw Deputy Vailes with his boot on Jamail's face at two moments, but she did not see Deputy Vailes keep his foot on Jamail's face for any sustained period. More important, she was not looking out the window at the critical time when Deputy Vailes walked away, so she did not see Jamail's condition at that time or whether he was breathing. Those present with

---

[21] 328 S.W.3d at 534 (cause of infection).

[22] 633 S.W.2d at 809 (cause of skull fractures).

[23] *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) (expert required to say whether work injury activated and accelerated tumor malignancy and caused death).

[24] *Rodriguez v. Medders*, No. 10-11-00369-CV, 2012 WL 4862588, at *5 (Tex. App.—Waco Oct. 4, 2012, no pet.) (whether decubitus ulcers caused death was outside general experience of laypersons) (mem. op.).

Jamail, on the other hand, gave unrefuted testimony that Jamail's airway was not obstructed and that he continued breathing until after Deputy Vailes left the immediate scene. Both Richardson and May testified that Jamail was breathing as he was rolled onto his side so that he could be placed on a backboard and lifted onto a stretcher. Deputy Reese and Corporal Haver also stated that Jamail was breathing when he was placed on the backboard;[25] it was only when Jamail was lifted onto the stretcher that they, and the EMTs, became concerned about Jamail's breathing. According to Richardson, he did not hear "snoring" or "deep, labored respirations," which potentially signaled a problem, until they were wheeling Jamail towards the ambulance.

Even if the jury could have reasonably inferred that Deputy Vailes's foot remained on Jamail's face for two to five minutes, Lansdale did not say and would not know from viewing the scene as a "casual observer" from inside the drive-through window whether Jamail's airway was ever completely obstructed or whether he died. She did not testify that Jamail stopped breathing or that she believed he was dead. Though Lansdale said Jamail looked "dead or in a coma" right after Richardson gave the first injection, she was describing Jamail's condition immediately upon falling to the ground before she saw Deputy Vailes's foot on Jamail's face.[26] Lansdale did not know whether Jamail was dead or alive at that time, and she offered no further testimony whether he appeared dead later.

---

[25] According to the Harris County Sheriff's Office incident report, Deputy Reese became concerned about Jamail's breathing once they had placed him on the backboard, but Jamail was breathing and making noises at that time, after Deputy Vailes left. Corporal Haver also became concerned after Jamail was placed on the stretcher; she noted that Jamail's "breathing was shallow" at that point. Both Deputy Reese's and Corporal Haver's trial testimony was consistent with their reports during the Sheriff's Office investigation.

[26] Lansdale's precise words were that "[h]e looked to either be dead or in a coma. I could not tell."

Appellees also cite an acknowledgement by the defense expert that the events described by Lansdale "could have caused" Jamail's death if "the evidence in this case indicated that there was no movement, [Jamail] made no sounds, he was unresponsive, and a boot was place over his mouth for a period of five minutes." However, whether the sequence of events described "could" have caused death is not legally sufficient. *Columbia Med. Ctr. of Las Colinas*, 271 S.W.3d at 247 ("can" and "could" are not sufficient to support causation).

We hold that the lay testimony appellees presented is legally insufficient to prove that Deputy Vailes caused Jamail's death by suffocating him. Appellees' evidence, viewed in the light most favorable to the verdict, does not establish a "sequence of events which provides a strong, logically traceable connection between the event and the condition." *Guevara*, 247 S.W.3d at 668. Thus, expert evidence was necessary to establish appellees' alleged causal link. *See Jelinek*, 328 S.W.3d at 534-35.

Moreover, given the circumstances surrounding Jamail's death, in particular the significant medical evidence of a plausible cause of death other than suffocation, a jury simply could not have found that Deputy Vailes proximately caused Jamail's death unaided by expert evidence. The evidence showed conclusively that Jamail ingested a substantial amount of cocaine on the night in question, which immediately prompted his 911 call. Harris County medical examiner Dr. Dwayne Wolf testified that Jamail died of "acute cocaine toxicity"—the cause of death identified in the medical examiner's autopsy report. Although the report contained additional pathologic diagnoses—pulmonary edema and congestion, bronchoaspiration of gastric contents, and minor blunt trauma, including abrasions on Jamail's face and contusions around his wrists and on his leg, ankle, and one of his toes—Dr. Wolf confirmed that Jamail did not choke on his own emesis, or vomit, and suffocate. As

40

Dr. Wolf explained, the "little bit of gastric contents" found in Jamail's lungs was consistent with "people dying from all sorts of causes."[27]

The toxicology report identified the cocaine concentration in Jamail's blood as 0.37 mg/L, with the cocaine metabolite benzoylecgonine measuring 0.62 mg/L. Harris County chief toxicologist Dr. Teresa Gray explained that a cocaine blood concentration of 0.37 mg/L was higher than the vast majority of cocaine deaths in Harris County in 2015. She stated, "Only 10 percent of the cocaine deaths [in 2015] had concentrations greater than .37." She also discussed several studies in which cocaine blood concentrations in cocaine-related deaths were much higher than that measured in Jamail's death. She testified that studies on cocaine use have wide variances in cocaine concentration in the blood, with some people showing no effect, an adverse effect, or death at varying degrees of cocaine concentration. In that vein, appellees cite a reference text in the toxicology community reporting studies showing that in some instances of acute cocaine use, persons with concentrations of .75 mg/L had no adverse effects, and one person with a concentration of 3.87 mg/L did not exhibit toxicity symptoms. Another text stated that cocaine concentrations of less than .3 mg/L are generally considered "clinically therapeutic."

Appellants presented the testimony of two additional medical experts: Dr. Vincent DiMaio, an expert on excited delirium syndrome, and Dr. Tom Neuman, an expert on asphyxiation. Dr. DiMaio opined that, in all reasonable medical probability, Jamail "died of excited delirium syndrome brought on by acute cocaine psychosis." Dr. DiMaio explained that Jamail died of "a cardiac arrhythmia as an

---

[27] As appellees emphasize and Dr. Wolf conceded, the particular medical examiner who performed the autopsy on Jamail was fired within one year after performing the autopsy because she was indicted for insurance fraud. Appellees relied on this fact at trial to undermine the autopsy's credibility and hence the defendants' theory. Regardless, appellees retained the *affirmative* burden to prove their own theory and establish why it was superior to acute cocaine toxicity as another highly plausible cause of death.

induced irregular beating of the heart due to excited delirium, which is essentially an overdose of the body secretions, particularly adrenaline and noradrenaline caused by acute cocaine intoxication." Dr. Neuman explained that Jamail could not have died of asphyxiation related to the placement of Deputy Vailes's boot over Jamail's nose and mouth.

Based on our review of the record, we cannot say that the cause of Jamail's death is within the "general experience and common sense of laypersons . . . to evaluate the conditions and whether they were probably caused by the occurrence." *Jelinek*, 328 S.W.3d at 534; *Guevara*, 247 S.W.3d at 668. Under these circumstances, whether Jamail died from suffocation as a result of Deputy Vailes's actions or died of acute cocaine toxicity is outside the common knowledge and experience of jurors and is not a matter "apparent to the casual observer." *Jelinek*, 328 S.W.3d at 533. Thus, appellees were required to present expert evidence establishing a reasonable medical probability that Deputy Vailes proximately caused Jamail's death by suffocation, and excluding with reasonable certainty the other plausible cause that Jamail died from acute cocaine toxicity. *See JLG Trucking*, 466 S.W.3d at 162; *Crump*, 330 S.W.3d at 218.

Appellees presented their own toxicology expert, Dr. Ernest Lykissa. Dr. Lykissa is a Ph.D., but not a physician.[28] He testified that findings of pulmonary edema congestion and bronchoaspiration of gastric contents, such as those made in Jamail's autopsy, are often seen in autopsies of people who drowned. However, Dr. Lykissa did not opine as to the cause of Jamail's death because he was not qualified to do so and the trial court excluded him from expressing an opinion in that regard. Despite the court's ruling, Dr. Lykissa stated that, given his knowledge of the facts

---

[28] Dr. Lykissa's title indicates his Ph.D. in toxicology, not his status as a licensed physician. Dr. Lykissa is not a licensed medical doctor in the United States or Canada.

and evidence in this case, Jamail's death was not caused by cocaine. Even so, because he was unqualified to testify as to the cause of death, he neither stated that Jamail died of suffocation nor explained why appellants' proffered theory that Jamail died of suffocation was medically superior to the medical evidence that he died of cocaine toxicity. *See Gunn v. McCoy*, 554 S.W.3d 645, 665 (Tex. 2018).

In sum, appellees presented no expert evidence of causation, and the lay testimony fails to meet their burden. We therefore conclude that the jury's proximate cause finding pertaining to the wrongful death damages is unsupported by legally sufficient evidence. We sustain Deputy Vailes's second issue. We need not address Deputy Vailes's factual insufficiency argument.

Deputy Vailes does not challenge the evidence supporting the survival damages. Because we have rejected his qualified immunity argument, we leave the survival damages undisturbed except as explained below in our discussion of appellees' cross-issue.

4. *Any jury charge error as to the unreasonable seizure question is harmless.*

Deputy Vailes contends the trial court reversibly erred in submitting a jury question on unreasonable seizure (question two) because it constituted a "double submission" of excessive force (question one). We need not address this point. As we have determined, legally and factually sufficient evidence supports the jury's findings in response to question one, which independently support the trial court's judgment even assuming question two had not been submitted. Thus, any error was harmless. *See* Tex. R. App. P. 44.1(a); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam) (explaining that error in charge is harmless "when the findings of the jury in answer to other issues are sufficient to support the judgment").

We overrule Deputy Vailes's third issue.

5.      *The exemplary damage award against Deputy Vailes is supported by legally sufficient evidence.*

In his fourth issue, Deputy Vailes contends that the jury's $5,000 exemplary damage award against him lacks legally and factually sufficient evidentiary support.

The trial court instructed the jury that an award of exemplary damages must be based on "clear and convincing evidence," which means "the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established."   Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010).   This standard of proof is an intermediate standard "falling between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings."  *In re G.M.G.*, 444 S.W.3d 46, 54 (Tex. App.—Houston [14th Dist.] 2014, no pet.).   When, as here, the party's burden of proof is heightened, we must apply a heightened standard of review to sufficiency of the evidence challenges.  *See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

Punitive damages may be awarded in section 1983 cases "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Heaney v. Roberts*, 846 F.3d 795, 803 (5th Cir. 2017) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  The purpose of such damages is to punish as well as to deter future egregious conduct in violation of constitutional rights. *Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).  A jury has discretion to award punitive damages when it deems it necessary to punish and deter the defendant. *See id.*  Deputy Vailes argues, and we agree, that appellees presented no evidence that he was motivated by malicious or evil intent.   However, crediting Lansdale's testimony, the jury

reasonably could have formed "a firm belief or conviction" that Deputy Vailes's conduct amounted to reckless or callous indifference to Jamail's right to be free from excessive force. Deputy Vailes acknowledged that, if he behaved as Lansdale described, then he would have committed assault. *Cf. Williams v. Kaufman County*, 352 F.3d 994, 1015-16 (5th Cir. 2003) (explaining that reckless or callous indifference requires "recklessness in its subjective form, i.e., a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations").

Under these circumstances, considering the evidence in the light most favorable to the jury's verdict, we conclude that the jury's award of $5,000 in punitive damages against Deputy Vailes is supported by legally sufficient evidence. Further, considered in a neutral light, the jury's finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust; accordingly, factually sufficient evidence likewise supports the jury's verdict.

We overrule Deputy Vailes's fourth issue.

## C. Appellees' Cross-Issue

In their sole cross-issue, appellees contend that the trial court erred by reducing Jamail's survival damages based on the jury response to question ten, the only proportionate responsibility question in the court's charge. Question ten provided:

> For each individual or entity that you found caused or contributed to *cause the death* of Jamail Amron, find the percentage of responsibility attributable to each:
>
> Your answers must be in whole numbers and must equal 100%.
>
> 1. Defendant Harris County      60   %
> 2. Defendant Kevin Vailes      20   %

3. Jamail Amron                    20     %

(Emphasis added).  As the emphasized language shows, the jury's answer to this question apportions responsibility only for Jamail's death.  The jury was not asked to apportion responsibility for survival damages.  Even though the jury awarded survival damages in addition to death damages, the trial court, over appellees' objection, reduced appellees' recovery of survival damages by the 20% apportionment finding applicable to the death damages.

Texas Civil Practice and Remedies Code section 33.003 requires proportionate responsibility to be determined for each cause of action.  *See* Tex. Civ. Prac. & Rem. Code § 33.003(a).  Wrongful death and survivor claims are legally distinct causes of action.  *See Cunningham v. Haroona*, 382 S.W.3d 493, 508 (Tex. App.—Fort Worth 2012, pet. denied); *see also* Tex. Civ. Prac. & Rem. Code § 71.002 (defining wrongful death cause of action); *id.* § 71.021 (defining survival cause of action).  The damages recoverable in a survival action are those that the decedent suffered while alive.  *Cunningham*, 328 S.W.3d at 508; *see also Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 345 (Tex. 1992).  In contrast, the "damages recoverable in a wrongful death action are for the exclusive benefit of the defined statutory beneficiaries and are meant to compensate them for their own personal loss."  *Cunningham*, 382 S.W.3d at 508 (citing *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644 (Tex. 2009) (orig. proceeding)).

Proportionate responsibility is a defensive issue on which the defendant bears the burden of proof.  *See Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 209-10 (Tex. 2015).  Here, neither Harris County nor Deputy Vailes secured any finding to apportion responsibility for Jamail's survival damages.  Because survival and wrongful death are different causes of action and compensate for different types of damage, a proportionate responsibility finding for a wrongful death cause of action

46

generally will not by itself support reduction of survival damages. *See* Tex. Civ. Prac. & Rem. Code § 33.003(a); *cf. Cunningham*, 382 S.W.3d at 502 (noting that trial court properly submitted survival liability, proportionate responsibility, and damages questions, in addition to similar wrongful death questions).[29] We think this general proposition applies here, where no party requested apportionment of survival damages, and we have no cause to scrutinize the evidence supporting the award. Deputy Vailes neither challenges its sufficiency nor argues that this is the type of case where the claimant's conduct contributing to his death necessarily contributed to his pre-death pain and suffering. The jury may have awarded pain and suffering damages based solely on its finding that Deputy Vailes stepped on Jamail's face while he was handcuffed and unresponsive. Accordingly, we conclude that the jury's apportionment of responsibility for death damages does not apply to the survival damages. The trial court erred in reducing appellees' recovery of survival damages by 20%.

We sustain appellees' sole cross-issue.

## Conclusion

Appellees did not establish that Deputy Vailes's constitutional violations were inflicted pursuant to an act or decision of a Harris County final policymaker responsible for the area of county business at issue. Thus, Harris County is not liable under section 1983 for any damages, and we reverse and render a take-nothing judgment in Harris County's favor as to all appellees.

---

[29] We note that the jury was not asked whether any of the parties proximately caused Jamail's injuries, if any, prior to his death. However, appellants do not raise this issue in their briefs, and we treat it as an omitted finding presumptively supported by evidence. *See* Tex. R. Civ. P. 299.

47

Additionally, we hold that appellees presented legally and factually sufficient evidence that Deputy Vailes used excessive force and that he is not entitled to qualified immunity. Appellees, however, failed to present legally sufficient evidence that Deputy Vailes's constitutional violations caused Jamail's death, so we reverse the portion of the judgment awarding appellees $10,000,000 in wrongful death damages. Because Deputy Vailes has not challenged the survival damages, and because we have sustained appellees' cross-issue regarding those damages, we modify the judgment to award appellee Coats, in her capacity as personal representative of Jamail's estate, $1,000,000 in damages from Deputy Vailes for Jamail's pain and mental anguish, plus applicable pre- and post-judgment interest, and we affirm that portion of the judgment as modified.

We also hold that legally and factually sufficient evidence supports the jury's award of $5,000 in exemplary damages against Deputy Vailes, and we affirm that portion of the judgment.

Finally, the judgment awards appellees $450,000 in reasonable and necessary attorney's fees through trial, plus a maximum of $260,000 in conditional appellate fees, against both Harris County and Deputy Vailes. The parties submitted the issue to the court. The award is based on a right of fee recovery under section 1988. *See* 42 U.S.C. § 1988. Reasonableness of attorney's fees under section 1988 is governed by a number of factors, but the most "crucial" one is the degree of the claimant's success. *Hensley v. Eckerhart*, 461 U.S. 424, 432-37, 439 (1983). We have reversed the judgment against Harris County, and we have materially reduced the damages recoverable from Deputy Vailes. Therefore, in the interest of justice, we reverse the award of attorney's fees, and we remand the case for reconsideration of attorney's fees to be awarded against Deputy Vailes. *See* Tex. R. App. P. 43.3(b); *Kartsotis v. Bloch*, 503 S.W.3d 506, 520-21 (Tex. App.—Dallas 2016, pet. denied) (remanding

in the interest of justice attorney's fees award for reconsideration whether fees were "equitable and just" after reversal of declaratory judgment on appeal); *Drabek v. Cavazos*, No. 13-14-00063-CV, 2014 WL 4402501, at \*3 (Tex. App.—Corpus Christi Aug. 29, 2014, pet. denied) (mem. op.) ("We have broad discretion to remand the issue of attorneys' fees in the interest of justice.").


/s/    Kevin Jewell
       Justice


Panel consists of Justices Christopher, Wise, and Jewell.